*Decision will be entered under Rule 50.*

STANDARD KNITTING MILLS, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 100834. Promulgated July 14, 1942.

*George D. Brabson, Esq.*, and *J. G. Korner, Jr., Esq.*, for the petitioner.

*Oliver L. Bright, Esq.*, for the respondent.

# 302

Disney: Section 501 (a) (1), Revenue Act of 1936,[1] provides what is known as the "unjust enrichment tax", being 80 percent of net income of every person "from the sale of articles with respect to which a Federal excise tax was imposed on such person but not paid." Two limitations are, so far as here material, set on the amount subject to tax: (1) It shall not exceed the amount attributable to shifting the tax to others, and (2) it shall not exceed net income for the entire taxable year from sale of the articles with respect to which the excise tax was imposed. Section 501 (e) (2)[2] provides, so far as here applicable, a method of determining a presumption as to the amount of the shift of tax to others; and section 501 (i) (1) and (2)[3] contains pro-

[1] SEC. 501. TAX ON NET INCOME FROM CERTAIN SOURCES.

(a) The following taxes shall be levied, collected, and paid for each taxable year (in addition to any other tax on net income), upon the net income of every person which arises from the sources specified below:

(1) A tax equal to 80 per centum of that portion of the net income from the sale of articles with respect to which a Federal excise tax was imposed on such person but not paid which is attributable to shifting to others to any extent the burden of such Federal excise tax and which does not exceed such person's net income for the entire taxable year from the sale of articles with respect to which such Federal excise tax imposed was imposed.

[2] (e) For the purposes of subsection (a) (1), (2), and (3), the extent to which the taxpayer shifted to others the burden of a Federal excise tax shall be presumed to be an amount computed as follows:

(2) If the taxpayer so elects by filing his return on such basis, from the aggregate selling price of all articles with respect to which such Federal excise tax was imposed and which were sold by him during the taxable year (computed without deduction of reimbursement to purchasers with respect to such Federal excise tax) there shall be deducted the aggregate cost of such articles, and the difference shall be reduced to a margin per unit in terms of the basis on which the Federal excise tax was imposed. The excess of such margin per unit over the average margin (computed for the same unit) shall be multiplied by the number of such units represented by the articles with respect to which the computation is being made; * * *

[3] (i) Either the taxpayer or the Commissioner may rebut the presumption established by subsection (e) by proof of the actual extent to which the taxpayer shifted to others the burden of the Federal excise tax. Such proof may include, but shall not be limited to:

(1) Proof that the change or lack of change in the margin was due to changes in factors other than the tax. Such factors shall include any clearly shown change (A) in the type or grade of article or materials, or (B) in costs of production. If the taxpayer asserts that the burden of the tax was borne by him while the burden of any other increased cost was shifted to others, the Commissioner shall determine, from the respective effective dates of the tax and of the other increase in cost as compared with the date of the change in margin, and from the general experience of the industry, whether the tax or the increase in other cost was shifted to others. If the Commissioner determines that the change in margin was due in part to the tax and in part to the increase in other cost, he shall apportion the change in margin between them.

(2) Proof that the taxpayer modified contracts of sale, or adopted a new contract of sale, to reflect the initiation, termination, or change in amount of the Federal excise tax, or at any such time changed the sale price of the article (including the effect of a change in size, package, discount terms, or any other merchandising practice) by substantially the amount of the tax or change therein, or at any time billed the tax as a separate item to any vendee or indicated by any writing that the sale price included the amount of the tax, or contracted to refund any part of the sale price in the event of recovery of the tax or decision of its invalidity; but the taxpayer may establish that such acts were caused by factors other than the tax, or that they do not represent his practice during the period in which the articles in question were sold.

visions with reference to evidence to rebut such presumption. The tax is an income tax. *Cincinnati Rubber Manufacturing Co.*, 46 B. T. A. 453. Upon cotton the processing tax was $0.042 per pound of lint cotton processed.

The petitioner, a processor of cotton, filed an unjust enrichment tax return for the taxable year 1935, on February 13, 1937, reporting $55,853.17 as the extent to which the tax was shifted to others. Though another was later filed on April 19, 1937, showing no tax, the former has been treated by the respondent as petitioner's return, and the petitioner at the hearing indicated a view that the return of February 13, 1937, complied with the statute.

Section 501 (e) (2), providing the presumption as to amount of shift of tax to others, in outline, sets up the following formula: First, ascertain, for the taxable year, the aggregate selling price of all articles sold with respect to which the excise tax was imposed. Second, deduct therefrom the aggregate cost of such articles. Reduce the "difference"—result of such subtraction—to a "margin per unit in terms of the basis on which the Federal excise tax was imposed"—in this case pounds of lint cotton processed by the taxpayer and sold in articles. The result is that for each pound of lint cotton sold in articles a "margin" (sec. 501 (f) (1)) between selling price and cost is ascertained. In identically the same way a margin (between selling price and cost) per pound of lint cotton processed and sold by the petitioner is ascertained as an average over a "base period" of six years next prior to the initiation of the excise tax. This is called the "average margin." (Sec. 501 (f) (1).) Average margin per unit for the base period is then subtracted from margin per unit for the taxable year and the excess, if any (called "excess margin"), is presumed to be the amount, per pound of lint cotton sold, in which the unpaid excise tax was shifted by the petitioner to others. Multiplying by the number of pounds of lint cotton contained in the articles sold in the taxable year and as to which the excise tax was not paid, gives the total amount of presumed tax shift. The presumption is, as above stated, subject to rebuttal by either petitioner or Commissioner.

The statute, section 501 (f) (3), defines selling price as meaning selling price minus certain amounts not here involved, so that for the purposes of this case selling price means the amount received upon sale. "Cost" is defined by section 501 (f) (2) as cost to the taxpayer of materials entering into the articles. In other words, the ordinary meaning of the word cost is narrowed for purposes of the section here involved, so that the "difference" between selling price and cost of materials only does not represent actual net profit, though for the sake of clarity sometimes herein it is referred to as "profit." The term "articles" is not defined by Title III, the title in which section 501 appears, though it is defined in Title VII.

During the base period and the taxable year petitioner spun yarn, i. e., it processed cotton. It also purchased yarn from others. These two kinds of yarn were then commingled in the weaving of the yarn by petitioner into cloth. The cloth so woven was then used by the petitioner to produce various kinds and grades of underwear.

The returns of the petitioner were filed under the provisions of section 501 (e) (2) above outlined and providing in effect computation of the presumptive amount of shift of tax to others by comparing the margin of profit in the tax year with the average margin over a test or base period of six years. ("Profit" is used herein only in a restricted sense, as above suggested, as representing the difference between selling price and cost of materials, as by statute prescribed.)

In his determination of the deficiency the respondent followed section 501 (e) (2) and determined an "excess margin" in 1935 of $0.16396111, that is, determined that such amount was the excess of the unit margin in the taxable year over the unit "average margin" in the base period covering the years 1927 to 1932, inclusive, and, multiplying by number of pounds of articles sold with excise tax unpaid, determined therefore that the aggregate amount of $354,737.57 was the extent to which the burden of the processing taxes was presumably shifted to others in 1935. However, pursuant to the provisions of section 501 (e) (3) of the Revenue Act of 1936, limiting net income subject to tax to the amount of the tax itself, the respondent limited the net income subject to tax to $90,868.97, an amount representing the processing tax of $0.042 per pound, imposed, but not paid, on 2,163,547 pounds of cotton processed by petitioner and sold in articles in 1935 after April 1. At the hearing the respondent filed amendments to his computations. The recomputations disclose a margin in 1935 of $0.1275994 in excess of the average margin, and a reduction to $276,-067.30 of the extent to which the burden of processing taxes was presumably shifted, without, however, any reduction in the $90,868.97 maximum unjust enrichment subject to tax. The deficiency determined by the respondent upon the basis of the election thus made by petitioner under the statute creates a presumption of shifting to others the full burden of the processing tax of $90,868.97. This presumption is rebuttable in whole or in part, by proof, in accordance with section 501 (i) (1) and (2), *supra.*

The principal difference between the parties herein lies in the interpretation of the meaning of section 501 (e) (2) as to the method for the determination of a presumption as to the amount in which the burden of the excise tax unpaid was shifted to others—rather than in the facts and figures to be used in applying it.

Primarily, the parties disagree, in effect, on two points: (1) The definition or meaning of "articles with respect to which a Federal excise tax was imposed on such person but not paid" (sec. 501 (a) (1)),

and (2) the interpretation of the expression in subsection (e) (2):
"the difference shall be reduced to a margin per unit in terms of the
basis on which the Federal excise tax was imposed"; i. e., they differ
as to what constitutes "articles with respect to which", etc., and as
to the proper manner of reducing to terms of basis of imposition
of excise tax. With regard to "articles" the petitioner argues, as its
chief contention, in substance that articles with respect to which
excise tax is imposed mean only the cotton content, so far as processed
by the taxpayer, entering the manufactured product and that the
true and proper rule is to eliminate everything except own-processed
cotton throughout the entire computation, i. e., in selling price, in
cost deducted therefrom, and in dividing the difference or "profit"
to reduce to the "margin per unit." Petitioner further says, however,
that if articles with respect to which excise tax is imposed mean the
manufactured product, in its entirety, and is not confined to the lint
cotton content thereof which is processed by petitioner, then the entire
weight of the article or product must be used throughout the com-
putation, not only in calculating selling price and cost of materials,
subtracted therefrom, but also as the divisor in dividing the "dif-
ference" (between selling price and cost of materials) to reduce to
"a margin per unit in terms of the basis on which the Federal excise
tax was imposed."

The respondent, however, takes the position that the statute re-
quires "article" to be defined as it is defined in Title VII, section
913 (d), Revenue Act of 1936, where it is provided:

When used in this title—

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

(d) The term "article" means the product which is obtained by processing
a commodity, and includes the product obtained by further manufacture or by
combination with other materials.

He therefore includes in his computation the entire selling price of
the articles sold by the petitioner, and subtracts therefrom the entire
cost of all materials forming the content thereof. From that point on,
however, his computation differs from that of the petitioner, for, in
reducing the difference or "profit" to "margin per unit", he divides
the difference between selling price and cost by only the number of
pounds of "own-processed" lint cotton content in the articles, and
not by the total number of pounds in the articles. Such method, the
petitioner argues, is improper and illogical.

The definition of articles with respect to which excise tax is imposed
and the method of reducing to margin per unit are both of impor-
tance here, because of the commingling, in the garments manufac-
tured by petitioner, of its own-processed cotton and purchased cotton
yarn, i. e., cotton already processed by another, the excise tax upon
which is not material to this proceeding. The inclusion, or elimina-

tion, of such purchased yarn is the prime controversy between the parties.

First, we consider the definition of "articles" with respect to which excise tax is imposed: Our analysis leaves it clear to us that the statute does not permit us to consider merely the own-processed cotton content as the article, that is, eliminate as petitioner urges, the purchased yarn, in arriving at the selling price of articles and in subtracting from the selling price of articles the cost thereof. Though we recognize that the definition in Title VII, section 913 (d), is not controlling, since it is preceded by the provision "When used in this title", nevertheless, when we consider the close connection and related nature of the two titles, covering as they do the same general subject, we think there would be inconsistency in the use of a definition different in effect in Title III, wherein appears section 501, here involved. The definition above quoted, since it comes from a title which does not govern here, is persuasive only, but it is plainly persuasive. Moreover, the definition of cost in section 501 (f) (2) is enlightening: "The term 'cost' means, in the case of articles manufactured or produced by the taxpayer, the cost to the taxpayer of materials entering into the articles." This plainly, we think, means cost of *all* materials entering into the product manufactured, and if all materials, that is, those composing the entire product, are to be included in computing cost, then the entire product is necessarily the "article" with respect to which the excise tax is imposed. Likewise if materials *enter into* articles, then the article is not a mere material, such as lint cotton. Again, the words "articles manufactured or produced" seem to connote more than a mere partial content of the materials comprising the product, which is, in effect, what petitioner regards as the proper use of "articles with respect to which a Federal excise tax was imposed." Also, section 501 (j) (1) provides that "a Federal excise tax shall be deemed to have been imposed with respect to an article, if it was imposed with respect to * * * any commodity or other article, from which such article was processed." This language clearly distinguishes between the "article" and a commodity (such as lint cotton) from "which such article was processed." The statute must be presumed to intend the usual and ordinary meaning for the term in question, which precludes, in our opinion, the use sought by the petitioner. We conclude that "articles" with respect to which the excise tax was imposed mean the product of processing, or of further manufacture, and that selling price, and cost subtracted therefrom to obtain "difference" under section 501 (e) (2), must be the entire selling price and cost of such product, in this proceeding cotton underwear.

We next examine the meaning and application of "the difference shall be reduced to a margin per unit in terms of the basis on which

the Federal excise tax is imposed"; that is to say, we proceed to determine what is the proper method of such reduction of the difference between selling price and cost of articles sold to a margin per unit of own-processed lint cotton pounds. To do so, the respondent simply divides the aggregate difference or "profit" by the number of pounds of lint cotton content in the articles sold. As above suggested, the petitioner contends that if the entire content of the articles is included in calculating selling price, cost, and therefore difference or profit, then the entire weight of the articles, and not mere own-processed lint cotton pounds, must be used as divisor to obtain the margin per unit. The point of difference between the parties is crucial. We have examined the question at much length, particularly because the two returns filed by the petitioner and the several examinations and computations made by the respondent show that it has given both parties much concern.

In our opinion, the statutory phrase is not properly interpreted or followed, and the unit margin properly ascertained by dividing the aggregate net difference or profit by only the weight of the own-processed lint cotton content, as the respondent has done. The statute requires that there be ascertained a "margin per unit" without specifying how it shall be done. That unit is plainly a pound of lint cotton. We therefore seek to learn what part of the aggregate "difference" or "profit" is to be ascribed to a pound of lint cotton. In our opinion, that object can be accomplished, and accomplished in compliance with the statute, by first ascertaining the proportion, by weight, which own-processed cotton bears to the entire weight of the articles sold, and by then taking that proportion of the aggregate "difference" or profit, thus arriving at a figure which, under the statute, is presumed to be the aggregate profit from own-processed cotton alone. Then by dividing such amount of profit presumed attributable to own-processed cotton, by the number of pounds of own-processed cotton, the result is a presumption of margin profit for a pound—the presumed "margin per unit" described by the statute.

This result is the same as dividing the aggregate profit by total number of pounds of articles, but this is true only because it is presumed under the statute that the profit made on own-processed cotton, and on foreign cotton, respectively, is in proportion to the weight thereof. That, we think, is the presumption contemplated by the statute. Merely dividing profit by total number of pounds of lint cotton content does not give a fair result. Thus, using a simple example, if 2,000 pounds of manufactured products producing a net profit of $10,000 contained 1,000 pounds of own-processed cotton and, in addition, contained 1,000 pounds of other materials, merely dividing $10,000 by 1,000 (respondent's method) would not fairly indicate that the profit per pound of own-processed cotton is $10, for the other

materials formed a large part of the weight and may have contributed a large part of the profit. But by taking, of the $10,000, one-half (the ratio that own-processed cotton, 1,000 pounds, bears to total weight, 2,000 pounds), the aggregate margin on the own-processed cotton, with respect to which the tax was imposed, is thus determined as $5,000, and then by dividing such aggregate margin by 1,000, the number of pounds of own-processed content, the margin per unit is ascertained, i. e., $5 per pound of own-processed cotton. On respondent's theory, the less the number of pounds of cotton, the greater the margin; thus, if instead of 1,000 pounds of own-processed cotton there were only 800 pounds, respondent would compute a profit margin of $12.50 per pound of own-processed cotton. In our opinion the only way such method and result can be justified is to assume that Congress intended that the own-processed lint cotton content should be presumed to earn *all* of the margin of profit and that presumably none of the profit is ascribable to other materials, such as purchased yarn or wool. Congress might conceivably have so intended the presumption, since it is rebuttable, yet further thought indicates to us that such was not the legislative intent; for if, for example, the own-processed cotton content were only 50 percent of the article, such as a garment manufactured equally from cotton and wool, it would be a hard presumption which would allocate the entire profit to the cotton and none to the wool. Such a result can not reasonably be considered within the intendment of the statute. We think that under the statutory language we should assume only that profit is earned in proportion to weight, by own-processed cotton and foreign material such as purchased cotton herein. We think that the object of the statute plainly is to ascertain as nearly as possible the actual margin of profit per pound of the processed commodity, in the base period and the taxable year, and to compare them. That object is attained by ascertaining in each period the proportion of profit margin attributable to own-processed commodity, here lint cotton, i. e., the amount of profit margin presumed to be earned by a pound of own-processed lint cotton, assuming that profit is earned in accordance with weight, a fair assumption. When such pound-margin ("average margin" for the base period) is compared with a "margin" obtained in the same way for the taxable year, it is clear that a fair comparison is obtained, free from variations because of difference in proportions of commodities manufactured, in base period and taxable period, and that thus is obtained a fairly computed presumptive excess of margin of profit, if any, from processing the commodity considered, in the taxable year, over that in the base period, providing a fair and accurate measure by which to presume that the tax was shifted, leaving for a rebuttal only other factors, such as operating costs, etc. We therefore conclude that the two margins should be ascertained by taking in each case, of the aggregate margin com-

puted for articles sold, that proportion which the processed commodity, here own-processed cotton, bears to the articles sold, and that the margin per unit should be determined by using as the divisor the pounds of own-processed cotton.

Before applying the method thus approved to the facts and figures herein involved, it is necessary to pass upon several differences between the parties, especially concerning sales of waste, losses sustained in dealings in cotton futures, and bad debts, all of which affect the amounts to which the method above determined must be applied.

First: The respondent included in aggregate selling prices amounts received upon the sale of waste cotton incident to the production of yarn. The petitioner insists that such waste does not constitute "articles with respect to which such Federal excise tax was imposed" and that the statute contemplates articles manufactured and sold in the regular course of business. We can not agree. Neither regulation nor controlling statute defines "article", yet we think that it is a "product which is obtained by processing a commodity" within the persuasive language of section 913 (d), above quoted, that waste is a byproduct, and that therefore the term "article" covers waste. The statute, in our view, was not meant to exclude that which, equally with the finished product, is the subject of sale and receipt of income. The waste, like imperfect garments or "seconds" which plainly could not be excluded, is the result of inability to perfect all material into garments desired. It is a part of the weight upon the basis of which the excise tax is imposed. If it was in anywise formed into a manufactured product, however simple—such as cotton pads or bandages—these would, under any reasonable definition of "article", come within the statute. We think that the waste, even though not so treated, fairly constitutes articles. Indeed, the evidence herein does not indicate that waste was left wholly unchanged. It was included in petitioner's computations in the return. We think it should not be excluded, and hold that the respondent did not err in including the amounts received therefor in aggregate selling price.

Next, the parties join issue on the question whether "cost to the taxpayer of materials entering into the articles" includes certain losses sustained by the petitioner in dealings in cotton futures; the petitioner contending that, since no cotton was thereby acquired, the amounts were improperly regarded by the respondent as cost of material. Although we think it clear that the transactions in cotton futures were not merely speculative, nevertheless in our opinion the respondent erred in his treatment of the losses. In *Commissioner* v. *Farmers & Ginners Cotton Oil Co.*, 120 Fed. (2d) 772, the court says: "A hedge is a form of price insurance; it is resorted to by business men to avoid the risk of changes in the market price of a commodity."

Regulations 95, article 1 (h), says:

In determining "cost to the taxpayer" and "price paid by the taxpayer" there may be included transportation and other charges incurred *in acquiring* such materials * * *. [Italics supplied.]

We think such regulation reasonably follows the statute, and that losses in hedging, a form of price insurance, or dealings in cotton futures, can not reasonably be held charges *in acquiring* the materials. We sustain the petitioner on the point, and the respondent's figures have been modified accordingly.

Also, the respondent reduced the selling price of articles by amounts for bad debts. Petitioner contends that the definition of selling price in article 1 (g) of Regulations 95 [4] precludes respondent from so doing. That article provides that "The term 'selling price' means the price received by the taxpayer from a vendee for the article in question * * *," and that "price received by the taxpayer" means "the invoice price less trade or other discounts." Respondent, in reply, says that it is immaterial with him whether we reduce selling price by bad debts or treat the item as an expense in production.

We agree with petitioner on this item. No accounting practice within our knowledge treats bad debts as a reduction in selling price. No business extending credit can avoid the risk of incurring bad debts, but they do not affect gross sales like cash discounts, which are, a reduction of sales price if the amount of the sale is paid within a prescribed time. Bad debts are deductible items, but not a cost of material under the applicable statute. Accordingly, the total selling prices should not be reduced by amounts for bad debts.

Further, the petitioner objects to the computations of margin and average margin by the respondent because like articles were not compared in the taxable year and base period. It is pointed out that, as petitioner did not manufacture athletic shirts in 1927 or 1928, only a small experimental number were produced in 1929, and that such garments produced in 1930, 1931, and 1932 were made from a type of cotton material different from that used in 1935, and therefore there is no means of computing its margin of profit on this article in the base period, thereby rendering it impossible to make a comparison with the margin in 1935. The contention is that like articles must be compared to reach a correct result, heavyweight underwear and athletic shirts being unlike articles, and that, since heavyweight under-

---

[4](g) *Selling price.*—The term "selling price" means the price received by the taxpayer from his vendee for the articles in question * * *.

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

"Price received by the taxpayer" means the invoice price, less trade or other discounts (except strictly cash discounts approximating a fair interest rate), including transportation and other charges incurred in delivering the goods, provided a consistent practice is followed by the taxpayer with respect to such items, in all computations under Title III.

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

wear was the only product manufactured by it during all of both periods, the marginal computation should be confined to that garment. The statute does not so limit the comparison. Section 501 (e) (2), *supra*, specifically provides that the difference between the selling price and cost of articles of the processor "shall be reduced to a margin *per unit* in terms of the basis on which the Federal excise tax was imposed." (Italics supplied.) Petitioner elected to file its return under that section and method. The "articles" produced by petitioner were various styles and weight of underwear and the excise tax was imposed upon lint cotton, the commodity from which the garments were manufactured. Thus the "unit" here is pounds of lint cotton and not the articles themselves. Any doubt as to the meaning of the provision is resolved by section 501 (i) (1), *supra*, authorizing the submission of proof of changes in margin due to "factors other than the tax", including "type or grade of article", to meet any presumption created by the computation under section 501 (e).

Section 501 (f) (1) provides that the term "margin" means "the difference between the selling price of articles and the cost thereof" and defines the term "average margin" as meaning "the average difference between the selling price and the cost of *similar* articles sold by the taxpayer during his six taxable years preceding the initial imposition of the Federal excise tax in question * * *." (Italics supplied.) Thus Congress did not confine the comparison to margins on identical articles but definitely contemplated that there would be changes in articles manufactured by broadening the comparison to similar articles. Regulations 95, article 1 (j) (1), furnishes a reasonable definition of "similar article", for purposes of computation under section 501 (e) (1):

* * * A "similar article" is an article which resembles in all respects another article, or, if the taxpayer had no articles resembling in all respects such other article, the similar article is one which most nearly resembles such other article in all material respects (such as quality, weight, size, content, and use).

At all times important petitioner manufactured garments from cotton. The principal change was from heavyweight underwear to heavy and lightweight underwear, a mere change of type or grade of article. In our opinion, the petitioner produced similar articles in the two periods compared, within the statute and regulation, even if the same criterion applicable to section 501 (e) (1) were here applicable. However, here we are proceeding under section 501 (e) (2), and therein the comparison is not of "articles", but of *units*. The language requires that the margin and the average margin shall be "computed for the same unit." That unit is a pound of lint cotton. Regulations 95, article 13, method II, provides that the commodity processed and entering into the margin computation be merely of the

same *kind*. This, in our opinion, is a fair interpretation of the statutory requirement that it be a comparison of the same unit. We find in the suggested difference in articles no valid attack upon the method employed by respondent in his computations.

We have found the selling price, cost of articles, and units processed and sold in the base period and the taxable year to be the amounts set forth in the amended unjust enrichment computation of respondent, adjusted, however, to reflect our holdings above set forth on the questions as to cotton futures and bad debts. These adjustments increase the average margin and margin determined by the respondent to $8,621,245.45 and $2,136,037.11, respectively. Applying now the method which we have above approved as to ascertaining amount of presumptive tax shift: As only 29,655,353/31,838,860 or 93.1420063 percent in the base period and 5,186,564/6,559,240 or 79.0726364 percent in the taxable year, of the weight of the articles, represented cotton processed by petitioner, such ratios and portions of the adjusted difference in the two periods, or $8,030,000.98 and $1,689,020.86, are the aggregate average margin and margin, respectively. By dividing such adjusted average margin for the base period by 29,655,353 and such adjusted margin for the taxable year by 5,186,564, these figures being the pounds of own-processed cotton in the respective periods, we determine a margin of $0.270777453 per unit in the base period and a unit margin of $0.32563141 in the taxable year. The difference between them, or "excess margin", is $0.054875688, and that amount, multiplied by 2,163,547, representing the units sold on which the excise tax was imposed but not paid, gives the amount of $118,726.13 as the extent to which the burden of the processing taxes was presumably shifted to others, without apportionment, however, for any production costs in 1935 in excess of those in the base period.

We have now interpreted section 501 (e) (2) and indicated, in our opinion, its proper application to the facts here presented. However, as above pointed out, the use of the method there laid down results only in a presumption as to the amount of excise tax shift by the taxpayer to others; and the presumption is rebuttable under section 501 (i) by either the Commissioner or the taxpayer. The petitioner urges that proof adduced by it meets the presumption and demonstrates that no tax is due. It is of course clear that under the statute either party may affect excess of margin over average margin by evidence, including such evidence as of increased cost of production, change in type or grade of manufacture, etc.

Invoices rendered by petitioner in 1933 contained separate charges for processing taxes. In 1934 petitioner's price lists contained statements that the specified prices included such tax. The price list published by petitioner for the fall season in 1935 contained nothing about

the taxes. The return filed by petitioner in April 1937 disclosed unjust enrichment in the amount of $55,853.17. At the hearing counsel for the petitioner admitted that petitioner made every effort to pass the tax on to its vendees, but was unable to do so in 1935.

The petitioner particularly urges that improved machinery, change in type of garment manufactured from heavy, full weight winter union undergarments to a light two-piece pattern and savings in costs are responsible for any excess of margin in the taxable year over the average margin of the base period, and that therefore there was no tax shift. The respondent himself adduced proof showing an increase in production costs in the taxable year amounting to $0.0346468 per unit more than those in the base period, and contends that this covers all change in production costs.

In an effort to rebut the statutory presumption, petitioner submitted in evidence, over strenuous objections of the respondent, computations purporting to show the profit per dozen and per pound of cotton of representative styles of garments in the respective periods. The proof was offered by deposition.

The computation primarily relied upon was prepared to show the production cost of groups of garments, itemized to include the cost of raw cotton and expense involved in converting it into cloth for use in the manufacture of garments and labor costs for cutting, seaming, folding, boxing, and packing, and the selling price thereof. We think the proof allowed by section 501 (i) is broad enough to include the computation and accordingly overrule (with exception granted) the objections made by respondent to the admission of the exhibit in evidence. Numerous errors, however, appearing in the exhibit greatly reduce its probative value: The petitioner used baled cotton weight, and not lint cotton weight, i. e., weight of bagging and ties were not deducted; also sales of cotton waste were not considered. The petitioner did not keep cost records for every style in each group of garments it produced and listed in the document, on account of which cost records kept for one style in each group was used as a basis for determining an average cost for the entire group by comparing the relationship of one group to another. The method followed was described by petitioner's cost accountant, who prepared the exhibit, as follows:

* * * I took my total cost on the annual statement and the dozens produced and sold, and searched our cost records, and arrived at a total cost for each group, and then turned to the cost records to find a month in which the respective garment would most nearly approximate the cost of each group which I had and I took similar costs from different garments in different groups to show each breakdown * * *.

The lack of production costs for each group of garments listed in the computation compelled the petitioner to use a balancing figure to make the total cost agree with its annual statement. For some items

it was necessary for petitioner to obtain costs from records kept in the subsequent year. These errors and others clearly appearing in the exhibit conclusively show that the cost figures set forth do not represent actual costs.

The selling prices used for each group are not in line with price lists published by the petitioner or actual selling prices, notwithstanding the fact that petitioner's books reflect total sales and the dozens of garments sold each year. Imperfect garments known as seconds are not reflected in the computations except to the extent that they are included indirectly in the figures for total sales. Neither do the computations reflect changes of prices during the year. The items of cost and selling price in the computations are in the final analysis nothing more than estimates and do not prove the extent to which costs and selling prices of various garments increased or decreased.

Petitioner further contends that testimony of its president alone is sufficient to show that the burden of the tax was not shifted. Among the facts alleged to be established by the witness' testimony and relied upon is one that profits on heavyweight winter underwear were constantly declining. His testimony, unsupported by records, is to that effect. Some of the documentary evidence just discussed herein reveals otherwise. For one group of underwear the exhibit shows a substantial increase of profit per dozen in 1930 over the three preceding years, a decline in 1931 and 1932, and an increase in 1935 over 1932. In another group the profit per dozen increased in 1931 over 1930, then decreased in 1932 slightly below 1930, and then increased in 1935. A reduction in profits is not of itself proof that the processor bore the burden of the tax, for the difference in results could be due to many other factors. See *Greenwood Packing Plant*, 46 B. T. A. 430. Neither does a mere showing that petitioner was required to manufacture lightweight underwear in greater quantities, commencing in about 1930, and to do so, to purchase new machinery and train employees to produce the new garment efficiently, answer our problem without some proof of how it affected the shifting of the burden of the tax. The rebuttal evidence offered by the petitioner, in our opinion, is in many respects vague and general and is insufficient to demonstrate increased cost of production above the amount shown by the evidence offered by the respondent, as above adjusted. We therefore conclude and hold that the above determined presumptive tax shift of $0.054875688 per pound is affected by rebuttal evidence only to the extent of increased costs of production. This we find to be not $0.0346468 per pound, as conceded by the respondent, but $0.028528261, because of the elimination, in computing costs of material, of losses from dealing in cotton futures and the elimination of bad debts from reductions in selling price. The concession was made on the theory that losses in cotton futures were costs of material, and that bad debts should be deducted

from selling price. Since we have hereinabove disagreed with that theory, the concession should accordingly be, and is, decreased.

However, section 501 (i) (1), with reference to rebuttal evidence and changes in cost, provides:

\* \* \* If the Commissioner determines that the change in margin was due in part to the tax and in part to the increase in other cost, he shall apportion the change in margin between them.

Since, under the computations as approved by us above, the presumptive excess margin less the amount of increased cost of production is less than $0.042 per pound, the amount of the excise tax imposed, it is obvious that the statute requires apportionment. The increased profit or "excess margin" should not, in the absence of evidence showing otherwise, be ascribed wholly either to shift of tax or wholly to increased cost of production, but apportioned between them in accordance with the method adopted in *E. W. Stockton*, 44 B. T. A. 514. We find no evidence herein demonstrating that the increased margin should be ascribed exclusively either to tax shift to others, or to increased production costs.

We therefore, in compliance with section 501 (i) (1), inquire what portion of the excess margin of $0.054875688 is ascribable to each: We add $0.042, the tax, to $0.028528261, the increased cost of production, giving a total of $0.070528261. Of such total, the excess margin, $0.054875688, is 77.8066653 percent. Therefore 77.8066653 percent of the $0.042 processing tax, or $0.032678799, is ascribable to tax shift, and the remainder, 22.2933347 percent, to increased cost of production. Multiplying $0.032678799 by the 2,163,547 units involved, i. e., pounds of lint cotton sold upon which the processing tax was unpaid, gives $70,702.12, the tax burden shifted. Accordingly, we hold this amount subject to the tax imposed by section 501 (a) (1), *supra*.

*Decision will be entered under Rule 50.*