Eugene H. Timanus, Receiver for Spencer Corporation v. Commissioner.
Eugene H. Timanus, Receiver for Spencer Corp. v. Commissioner
Docket No. 440 P.T.
United States Tax Court
1945 Tax Ct. Memo LEXIS 32; 4 T.C.M. (CCH) 1074; T.C.M. (RIA) 45362; November 28, 1945
Geo. E. H. Goodner, Esq., and Scott P. Crampton, Esq., for the petitioner. Irene F. Scott, Esq., for the respondent. DISNEY
Memorandum Findings of Fact and Opinion DISNEY, Judge: This proceeding is brought to review the disallowance by the *33 Commissioner on June 30, 1942, of a claim for refund of processing taxes, penalties and interest in the amounts of $104,396.41, $211.57, and $659.55, respectively, or a total of $105,267.53, paid for the period from August 1, 1933, through February 28, 1935. On September 29, 1942, a petition appealing from the rejection of the claim was filed with the United States Processing Tax Board of Review. When the Board was abolished December 31, 1942, the proceeding was transferred to this Court. The question presented is whether the taxpayer bore, in whole or in part, the burden of the processing taxes which it had paid. Findings of Fact Spencer Corporation was organized in 1918 as a corporation with its principal place of business at Spindale, North Carolina. Due to financial difficulties it went into receivership and L. M. Carpenter was appointed receiver by the United States District Court for the Western District of North Carolina on April 23, 1934. He was succeeded on October 26, 1935, by Eugene H. Timanus, an employee of the corporation since March 1935, who is still serving as receiver and is authorized to prosecute this claim. On March 26, 1935, its business, mill and other assets *34 were sold to Spencer Mills, Inc., a corporation, the receiver retaining only the corporation's claim for refund of processing tax. Timanus became treasurer and general manager of Spencer Mills, Inc., at that time. Spencer Mills, Inc., continued to operate in the same manner and to manufacture the same lines of goods. From 1931 through 1936 the plant and equipment were continued with no material changes, and the number of looms and spinning machines remained the same. From the time of its organization until March 26, 1935, the taxpayer (referring to Spencer Corporation prior to and during receivership) engaged in the operation of a fine or fancy goods mill manufacturing primarily all-cotton combed yarn and cloth. It also manufactured a combination cotton and rayon cloth and all-rayon cloth. The cloth manufactured consisted of shirtings, broadcloth, dress goods, handkerchief goods and the like. Its business was not seasonal but at certain times the production of the mill was greater than at other times. However, this increased production did not occur at regular periods each year. In the early part of 1933 the textile industry was depressed. One of the evils of the industry was intensive *35 competition, which the industry itself had attempted to correct without any appreciable success. After March 1933 it became apparent that legislation would be enacted by Congress which would affect not only the textile industry, but the cotton producer as well. The proposed legislation, among other things, contemplate the imposition of a processing tax, an increase of wages in the industry, and a curtailment of the production of cotton. It was generally recognized by the textile industry and purchasers of cotton goods that the enactment of such legislation would result in an increase in the cost of cotton goods. Consequently the demand for and sales of cotton goods increased greatly during the period from April through July 1933. The National Industrial Recovery Act was enacted in June 1933 and went into effect with respect to the textile industry on July 17, 1933. This act was held invalid, May 27, 1935. A.L.A. Schechter Poultry Corp. v. United States, 295 U.S. 495. Its enactment resulted in increased labor costs to taxpayer after its effective date. In May 1933 Congress enacted the Agricultural Adjustment Act. Under the provisions of this act, a processing tax was *36 imposed upon the first processing of cotton at the rate of 4.2 cents per pound of lint cotton. The tax became effective on August 1, 1933, and continued in effect until the act was held invalid by the Supreme Court on January 6, 1936. United States v. Butler, 297 U.S. 1. Pursuant to the Agricultural Adjustment Act and regulations promulgated thereunder, taxpayer, as first processor of cotton, filed monthly processing tax returns for the period August 1933 to April 1935, inclusive. The taxpayer paid to the collector for the district of North Carolina the processing taxes for the months August 1933 through February 1935 in the amount of $104,396.41, together with penalties in the amount of $211.57 and interest in the amount of $659.55, or a total amount of $105,267.53. Whatever amount may have been paid for processing taxes subsequent to February 1935 was paid into a trust fund in escrow under court order and returned to taxpayer subsequent to January 1, 1936. No refund has been made to the taxpayer of any part of the amount of $105,267.53, processing taxes, penalties and interest paid by it. On June 24, 1937, the taxpayer filed with the collector for the district *37 of North Carolina a claim for refund (P.T. Form 79) of $87,192.17 of the amount of processing taxes, penalties and interest paid for the period August 1933 through February 1935. On or about March 30, 1938, taxpayer filed an amended claim for refund (P.T. Form 79) of $105,267.53, with detailed schedules and information attached thereto. On June 30, 1942, the Commissioner disallowed the claim for refund, as amended, in full. The taxpayer sold its cloth through a selling agent in New York. Ordinarily the agent submitted to taxpayer specifications as to style, construction and quantity of the cloth or fabric desired for the purpose of obtaining a price. Upon receipt of specifications the taxpayer estimated the cost of the desired cloh upon one of its printed cost sheets captioned "Detailed fabric cost per yard." The purpose of the cost sheet was to arrive at a sale price to quote on the cloth specified by the agent. The cost items on the cost sheet included manufacturing, selling and overhead expenses, and depreciation, also the processing tax during the time the processing tax was in effect. The cost items entered on the cost sheet, except the cost of cotton and rayon and the processing *38 tax, were not actual costs, but theoretical costs, i.e., estimated costs determined by a firm of cost engineers employed for that purpose by taxpayer. On the basis of the conversion factor used on the cost sheets for determining manufacturing costs, the processing tax entered on the cost sheets was overstated. After a price had been suggested to the agent, he obtained, if an order was given, a signed "sale note" or order from the customer which was forwarded to theamill qt Spindale. The sale notes were numbered consecutively by the New York agent. An office copy was made of each sale note received and filed in a book kept in the office at Spindale for that purpose. After the cloth was manufactured, a bale ticket was made out. Each bale ticket was numbered and disclosed the construction or style number of the cloth, the number of pieces manufactured, the weight in pounds of each piece of coth, and the total weight of the bale. The bale tickets were sent from the mill to the office. Thereupon the cloth was invoiced, although it was not always immediately shipped to the customer. Invoices were numbered consecutively and each invoice showed, among other things, the date, customer's name, *39 the construction or style number, sale note or order number, bale number, number of pieces and yards in each bale, total yardage, price per yard, and total sales value or price. The cloth was shipped directly to the customer, but the invoice therefor was mailed to taxpayer's factor in New York City, who mailed the invoice to the customer and made the collection thereof. The factor guaranteed all accounts and paid the taxpayer. Yarn sales were not made through a factor. A portion of each pound of cotton when processed became waste. The conversion factor above referred to represents the portion or percentage of each pound of cotton processed which entered into the finished article. The factor was determined by the cost engineers and varied from time to time. The cotton processed, sales of all products, cost of cotton and rayon consumed, manufacturing and other expenses during the period January 1, 1933, to and including July 31, 1933, and during the tax period, respectively, were as follows: Period
Tax Period
Jan. 1, 1933 to
Aug. 1, 1933 to
July 31, 1933
Feb. 28, 1935
Pounds of cotton opened and processed
1,618,794
2,485,629
Total sales of cotton, combination cotton and rayon, and all-rayon
coth, yarn and waste
$444,800.54
$1,217,011.81
Cost of cotton consumed
159,574.29
361,283.89
Cost of rayon consumed in manufacture of combined cotton and rayon
and all-rayon cloth
275.20
58,262.01
Manufacturing expense
253,641.53
758,658.38
Selling and overhead expenses
35,234.14
118,963.47
The item selling and overhead expenses in-
clude the following: Selling and overhead expense
$ 26,641.62
$ 92,360.60
Officers' salaries
7,066.66
17,458.32
Prepaid local taxes (1934)
None
61.60
Legal and audit fees
1,175.44
8,232.00
Dues and subscriptions
350.42
850.95
Total
$ 35,234.14
$ 118,963.47
*40 The manufacturing, selling and overhead expenses were incurred in the manufacture and/or sale of all-cotton, combination cotton and rayon, and all-rayon cloth and yarn. The ledger contained no account showing sales of all-rayon cloth separately. The books of taxpayer were kept on an accrual basis. Beginning July 1932 inventories were made monthly of raw products, supplies, stock in process and finished goods, together with financial statements. The inventories were not entered on the books except upon closing of the books at the end of the calendar year and at the time the receiver was appointed. Although such inventories and financial statements were preserved and were in taxpayer's office or plant to February 1, 1938, a search made there and elsewhere during the latter part of May 1941 and thereafter revealed only three of such monthly financial statements and inventories. These statements and inventories show inventories as follows: Dec. 31,
Feb. 25,
Apr. 1,
Apr. 29,
June 3,
1932
1933
1933
1933
1933
Cotton
$ 8,081.38
$ 5,584.41
$ 4,286.58
$ 8,429.56
$13,782.05
Yarn
926.30
999.20
1,070.50
670.90
465.20
Stock in process
29,420.39
27,128.56
28,162.25
27,776.37
37,912.88
Cloth
25,379.28
64,932.76
41,872.48
27,588.31
13,899.49
Manufacturing supplies, etc.
4,894.94
5,677.99
5,141.69
3,987.86
4,821.38
Total
$68,702.29
$104,322.92
$80,533.50
$68,453.00
$70,881.00
*41 No separate inventories of cotton cloth, all-rayon cloth or combination rayon and cotton cloth were kept. There was no inventory of rayon on hand on December 31, 1932. Substantially all of the rayon purchased by taxpayer consisted of filament rayon which was would in a continuous strand on tubes or cones. A small amount of cut staple rayon was purchased. Such rayon was cut into lengths varying from about a half inch to about two inches. It required processing similar to that required by bale cotton, including opening, carding and spinning, to make it into yarn. It was then referred to as spun rayon. From August 1, 1931, to December 31, 1932, 613,128 pounds of rayon were purchased and a considerable quantity of all-rayon cloth was manufactured and sold in 1931 and 1932. A bale ticket found disclosed that two samples of new style numbers of all-rayon cloth were manufactured during 1933. A sample of cloth contains from 25 to 50 yards. The records available do not disclose whether or not the samples were billed to the customer at a price. Other than such bale ticket, there were no records available from which it could be determined whether or not any all-rayon cloth was manufactured *42 during 1933. There were no purchases of rayon in 1933 prior to October 28, 1933. The 1934 invoices disclose a billing to taxpayer's customers of 132,425 3/4 yards of all-rayon cloth, weighing 30,704 pounds, at a price of $35,686.44. In January and February 1935, 4,134 pounds of rayon were consumed in the manufacture of cloth. No records available disclose the portion thereof consumed in the manufacture of all-rayon cloth or the portion consumed in combination cotton and rayon cloth. The office manager of taxpayer, who had, continuously from April 1934, complete charge of its bookkeeping and books and records, remained at the plant in that capacity under the direction of the receiver until the mill was sold. In March 1935 he became office manager and secretary of taxpayer's successor and remained such until February 1, 1938, when he left its employ. At that time all the books and records of taxpayer for the period 1931 to March 28, 1935, and the records of its successor for the remainder of the year 1935 and for the year 1936, including sale notes or contracts, sales invoices, cost sheets, bale tickets, purchase records, inventories and correspondence, were in existence and located *43 in the office or a storage room in the Spindale plant. The first field investigation was made by two general deputy collectors for the Bureau of Internal Revenue in the latter part of 1939 and the early part of 1940. At that time all sales invoices for the years 1931 through 1936 were at the Spindale plant. However, after several searches for books and records, the first one of which was made on or about February 21, 1941, the only sales invoices found at the plant were invoices covering sales of cloth for the entire year 1934 and for the period from April 30, 1935, through December 31, 1935, and invoices covering sales of yarn and miscellaneous items for a period beginning about August 1, 1933, through 1934 and 1935 and part of 1936. On each of 44 of the available 1934 cloth invoices up to June 15, 1934, which billed cloth called for under sale notes or orders numbered 1051, 1233, 1250, 1257, 1286, and 1323, processing tax was billed as a separate item in the aggregate amount of $7,252.69. There were no invoices dated after June 15, 1934, among the invoices available on which the processing tax was billed separately. Sale note numbered 1326 was dated July 29, 1933. On each of 96 of *44 the available yarn and miscellaneous invoices, the dates on which ran from August 1, 1933, to October 13, 1933, processing tax was billed as a separate item in the aggregate amount of $1,294.92, and on each of 11 invoices thereof, with dates running from January 4, to June 29, 1934, processing tax was billed as a separate item in the aggregate amount of $121.37. On the basis of the conversion factor used in determining costs per yard, the processing tax was overstated on the above invoices on which the tax was shown as a separate item, and was billed at a rate of not less than 6 cents per pound. The taxpayer undertook to collect the processing tax on every pound of cotton opened after August 1, 1933, for the manufacture of cloth called for on orders received prior to, or after, that date, as to which the tax had not been included in the computation of cost and price suggested to the selling agent. The processing tax billed separately was not entered in a special processing tax account in the ledger, but was entered in sales account. Sale notes or orders received from the New York selling office, executed during the month of July 1933, bore upon their face a stamp in red ink as follows: *45 "In addition to the net price stated herein, buyer agrees to pay to the seller, upon collection of the Government, the amount which, because of this transaction or any portion hereof, the seller is required to pay to the Federal Government on account of taxes or charges not now existing. If such taxes or charges be imposed upon raw material, a proper allowance for waste is to be added." The following statement was also stamped in red ink on sale notes over a period of time not identified, and on one in particular dated September 18, 1933: "Prices on any undelivered portion of this contract are subject to increase or decrease due to governmental action under the 'Agricultural Adjustment Act' or the 'National Industrial Recover Act,' or any further Federal legislation affecting the seller's costs, and deliveries may be modified to the extent necessitated by any such governmental action or legislation." After diligent search therefor, the taxpayer was unable to produce any of its sale notes or order contracts, except some, but not all, for the period from July 9, 1933, through December 27, 1933, or any of its cost sheets. It found its ledgers and the ledgers of its successor for *46 the period 1931 through 1936 and also the journals of both for the same period except for the first four months of 1935. Opinion The taxpayer claims that it bore the burden of the amount of $105,267.53, including penalties and interest, paid as processing tax for the period from August 1, 1933, to February 28, 1935, and that, therefore, it is entitled to a refund of the whole amount. Although the taxpayer in its original claim, amended claim and additional statements filed in support of its claim for a refund set forth various schedules, each containing a favorable prima facie showing, no substantiation of any one of them as correct and as complying with the provisions of section 907 of the Revenue Act of 1936 was made at the hearing. Petitioner was unable to locate its records necessary for that purpose. The general ledgers and journals of taxpayer and its successor covering the years 1931 to 1936, inclusive, except the journal for the first four months of 1935, were located and in its possession, but these did not contain the detailed data necessary to make the prima facie showing as required by the statute. All the books and records of taxpayer, particularly the style book *47 showing the construction of the various cloth it manufactured, cost sheets, production records, monthly inventories, sale notes or order contracts, and invoices, were at its plant up to February 1, 1938. As late as the early part of 1940, all the invoices of taxpayer and its successor for the years 1931 to 1936, inclusive, were located at the plant, but when, beginning in February 1941, search was made for records essential for the establishment of its claim for refund, no cost sheets, sale notes, invoices or inventories were found, except as stated in the findings of fact. There is no evidence of a deliberate destruction of such records. It does appear that when the receiver left Spindale in October 1939, no instructions were given to any one for the safekeeping and the preservation of the books and records. Thus, the taxpayer has not made a prima facie showing as permitted by section 907 (a) and (b) and does not rely upon any presumption in its favor. Indeed, on brief, the taxpayer does not rely on a statutory prima facie showing, but points out that at the hearing it assumed the burden of proof, i.e., the burden of proving "the actual extent to which the claimant shifted to others *48 the burden of the processing tax." Section 907 (e) of the Internal Revenue Code. As proof of the fact that it had not shifted the tax to others, the taxpayer contends, and this is its sole contention, that the evidence shows that its operating loss "per pound of cotton processed" during the tax period was 7.1079 cents greater than in the seven months immediately preceding the tax period. The respondent, without admitting the accuracy or reliability of the statements of operating loss for the respective periods as set up by taxpayer on brief, contends that the comparison of operating loss during the first seven months of 1933, with the operating loss during the tax period, does not establish whether the burden of the tax was borne or shifted by the taxpayer. He further contends that the computation of the operating losses for the respective periods is incorrect in that inventories were not considered and that there was no proper elimination of sales and expenses pertaining to all-rayon cloth. The contention of petitioner that it sustained an operating loss "per pound of cotton processed" is based upon statements of operating loss for the respective periods set *49 forth in its brief. The following schedule sets forth in the first and fourth columns the statements of operating loss for the respective periods as set up by the taxpayer in its brief and upon which it relies. In the first and second columns are set forth the figures applicable to all products as stipulated for the respective periods. Since the taxpayer manufactured and sold articles other than those made of the commodity subject to processing tax, viz., all-rayon cloth, it was necessary for it to eliminate from the stipulated amounts the portion thereof attributable to the manufacture and sale of all-rayon coth. In the third column appear the adjustments made by taxpayer to the figures in the second column to eliminate therefrom the portion attributable to all-rayon cloth. No adjustments in that respect were made by taxpayer to the figures appearing in the first column. First seven
months of 1933
Applicable to
all products
Sales
$444,800.54
Cost of cotton
159,574.29
Cost of rayon
275.20
Manufacturing expenses
253,641.53
Selling and overhead
35,234.14
Processing tax
$448,725.16
Operating loss
$3,924.62
Pounds of cotton consumed
1,618,794
Operating loss per pound $0.0024244
*50 Tax Period - August 1, 1933, to February 28, 1935
Applicable to all
Applicable to
Applicable to
products other
all products
all-rayon
than all-rayon
Sales
$1,217,011.81
$42,583.64
$1,174,428.17
Cost of cotton
361,283.89
361,283.89
Cost of rayon
58,262.01
30,519.94
27,742.07
Manufacturing expenses
758,658.39
10,621.22
748,037.16
Selling and overhead
118,963.47
4,163.72
114,799.75
Processing tax
105,267.53
105,267.53
$1,402,435.28
$45,304.88
$1,357,130.40
Operating loss
$ 182,702.23
Pounds of cotton consumed
2,485,629
2,485,629
Operating loss per pound
$0.0735034
The fact that taxpayer operated at a loss "proves nothing with respect to shifting the tax." Wilson Milling Co., 1 T.C. 389, 393, affirmed (CCA-8) 138 Fed. (2d) 249, certiorari denied, 320 U.S. 800 (where sales did not cover costs and expenses of operating). In Byars v. Commissioner, (CCA-5) 138 Fed. (2d) 513, wherein the taxpayer contended that proof of a net operating loss during the tax period established that the burden of the tax had been actually borne by him, the court stated: *51 The fallacy of this argument is readily apparent. The net operating loss sustained by the bankrupt may have been attributable to high operating expenses, depressed market conditions, labor difficulties, an unsound financial basis, or any one or more of innumerable causes. The mere fact that a net operating loss was sustained means nothing unless the claimant can also show that such loss resulted from paying the processing taxes and bearing the burden thereof. * * * * *
Section 902 of the Revenue Act of 1936 specifies the conditions upon the allowance of refunds that must be met before a refund may be ordered. The Congress made clear its purpose that refunds should be allowed only to claimants who had paid, and had sustained the economic burden of, the tax. No attempt was made to insure processors against a net operating loss for the tax period, or to guarantee a reasonable return upon invested capital. * * * Though petitioner's reply brief was filed later than that of the respondent, which cited the Byars case, petitioner does not refer to, or discuss it. Furthermore, the "fact of continued net losses cannot operate to impair the effect of the evidence that the prices at *52 which the goods were sold were set with a view to recover the tax paid." Vennell v. United States, 36 Fed. Supp. 646; affirmed, per curiam (CCA-3), 122 Fed. (2d) 936. See Standard Knitting Mills, Inc., 47 B.T.A. 295, 314; affirmed, (CCA-6) 141 Fed. (2d) 195. The petitioner in particular relies upon TennesseeConsolidated Coal Co. v. Commissioner (CCA-6), 139 Fed. (2d) 47. This case is distinguishable upon the facts. It involved a deficiency in unjust enrichment tax for 1936. The taxpayer was subject to a coal tax of approximately three cents per ton of coal under the Bituminous Coal Conservation Act of 1935, and filed monthly tax returns for November 1934 to March 1936, inclusive. In December 1935 it obtained an injunction against the collection of the tax and when the Act was declared unconstitutional, it was accordingly relieved of liability for such taxes. No such tax was ever paid by taxpayer or accrued on its books or taken into consideration in its accounts in any manner. It did not add the tax to its invoices and had no side agreements with its customers regarding the coal tax. Pursuant to a union labor contract, *53 wages were increased dating back to October 1, 1935. Most of taxpayer's coal was sold on contract. Most of the customers, with whom taxpayer had contracts, refused to take coal at higher prices, and after January 1, 1936, there were only three contract customers, who purchased 380.15 tons as compared with 115,418.45 tons mined in January-April 1936, to whom coal was shipped at increased prices. Furthermore, although taxpayer increased prices on spot sales as much as possible in order to overcome the loss of profit on contract sales, the average price per ton decreased after the incidence of the tax as compared with the price for the prior three-month period, four-month period and twelve-month period. In the instant case there was increase in price. Also, in the absence of consideration of all operating expenses (and not merely labor and supplies) in arriving at the conclusion in that case that there was a less realization per ton in the taxable period than in the basic period, it offers no parallel helpful here. Clinchmore Coal Mining Co. v. Commissioner (CCA-6), 143 Fed. (2d) 112, is also so distinguishable on the facts as not to control here. The case involved deficiencies *54 in unjust enrichment tax for 1935 and 1936. In that case the taxpayer did not add the tax to its invoices. On or about the effective date of the socalled Guffey Coal tax the price at which it sold its coal was increased, but this increase was precipitated by an increase in labor costs as the result of a new union labor contract which became effective at about the same time. Although the increase per ton was in excess of the amount of the actual increase in labor costs, other operating expenses increased also, so that the taxpayer's net realization or net profit for the tax period was approximately equal to the average realization or profit for the corresponding period of the next preceding year. It would serve no useful purpose to discuss other cases cited by taxpayer. Moreover, even if we assume arguendo that the sales in the respective operating loss statements above set forth, correctly show the dollar sales of all products other than all-rayon cloth, the average sale price per pound of cotton processed in the seven months period was 27.47728 cents ($444,800.54 divided by 1,618,794) whereas the average sale price per pound of cotton processed in the tax period was 47,24873 cents *55 ($1,174,428.17 divided by 2,485,629). Thus the average sale price per pound of cotton processed during the tax period was 19.77145 cents in excess of the average price in the seven months immediately preceding the tax period. The taxpayer apparently assumes that the entire increase was for the purpose of recovering costs other than the tax. The only evidence with respect to any increase in costs during the tax period, other than the tax, which was taken into consideration in computing cost upon which a price was quoted, was an increase in labor costs resulting from the enactment of the National Industrial Recovery Act. According to taxpayer's figures manufacturing expenses per pound of cotton processed in the seven months period was 15,66855 cents ($253,641.53 divided by 1,618,794) and in the tax period 30.09448 cents ($748,037.16 divided by 2,485,629), or 14.42593 cents higher in the tax period than in the seven months period. If such increase was entirely due to increased labor costs, there still remained 5.34552 cents of the average increase in price of 19,77145 cents, which was more than sufficient to cover the tax. The evidence is undisputed that taxpayer in all its cost sheets *56 beginning August 1, 1933, included the tax at a higher rate than 4.2 cents a pound of cotton as a part of cost, and that quotations to the selling agent were based upon these cost sheets. It is also undisputed that in the case of orders uncompleted on August 1, 1933, and as to which the tax had been omitted in the computation of cost, the tax was thereafter billed as a separate item as such orders were completed. From the invoices available it appears that a total of $8,668.98 was so billed and there is no evidence or contention that it was not collected. From the foregoing it is reasonable to infer that it was the intention and settled practice of taxpayer in every instance possible to pass on the tax. The two cost sheets in evidence indicate that a price slightly higher than the estimated cost was quoted. It is not possible to determine whether or not the price agreed to be paid by the customers was more or less than the estimated cost as no cost sheet with its covering order or invoice was presented in evidence, except a cost sheet of taxpayer's successor dated May 23, 1935, which shows a total cost per yard of handkerchief goods including "Int., Depr. & Proc. Tax" of 13.67 cents. *57 The price on the invoice is 14 cents a yard. The evidence is that taxpayer's successor followed the same practice and procedure as taxpayer had in the computation of costs and in the sale of its products. Although it was testified that the "goods were sold at market whatever we could get for them on the market," there is no evidence that market prices, such as are periodically reported in current trade journals or otherwise, were applicable to taxpayer's cloth which was not staple in nature. It was also testified that it was the practice to obtain contracts or firm orders, as they were called, before opening the cotton for manufacture; also that the mill did not make staple goods for sale on the general market. The record is silent as to whether or not there was an increase in market prices at the time the tax became effective or shortly thereafter so as to pass the tax on to the purchasers. More significant, however, there is no evidence that the price at which the products were billed were in fact less than the estimated costs. That taxpayer operated at a loss may have been due primarily to erroneous computation of costs. As stated in Wilson Milling Co., supra, "The *58 loss may well have been that much greater had petitioner not passed on the tax to its customers." However, the statements of operating losses set up by taxpayer neither correctly reflect the loss "per pound of cotton processed" as contended by taxpayer nor the net loss per pound of processed cotton sold for at least one reason, that is, that the taxpayer failed to take into consideration opening and closing inventories. Although there is testimony that taxpayer manufactured cloth on order only, the evidence is undisputed that taxpayer carried inventories of yarn and cloth, in process and finished, of substantial value. Obviously, in order to show the net loss or profit "per pound of cotton processed" for the respective periods, all the figures used in such statements must appertain to the "cotton processed" or the products manufactured from cotton opened and processed in the respective periods. The first item in the statements, "Sales," purportedly represents sales of all products (cloth, yarn and waste) other than all-rayon cloth. The amount of sales was taken from the general ledger and therefore represents the total sales value of all articles sold and not the sales value of all *59 products manufactured from cotton processed in the respective periods. The sales undoubtedly included sales of products carried in opening inventories. Since closing inventories were not taken into consideration, the sales value of in-process and finished products made from cotton opened and processed in the respective periods on hand at the end of each period was excluded from the amounts of sales used by taxpayer. Manufacturing and overhead expenses are as a matter of accounting, in case of one on an accrual basis, usually applicable to the articles manufactured. There is no evidence that in this case such expenses were applicable wholly to the sales in the respective periods. Selling expenses incurred in a given period of time are, as a matter of accounting, in case of one on an accrual basis, usually incurred in making sales which may consist of sales of the products on hand at the beginning of the year and a portion of the products manufactured during such period. The processing tax, an operating expense in the tax period, was imposed upon the pounds of cotton processed. Thus it appears that some of the figures used in the statements appertain to sales during the respective periods *60 whereas others appertain to the cotton processed or articles manufactured during the respective periods. Consequently the net loss shown in the statements neither reflects the operating loss "per pound of cotton processed," nor per pound of cotton processed sold. In order to properly reflect either, opening and closing inventories should have been considered. The only adjustments made by taxpayer to the figures as stipulated were adjustments intended to eliminate therefrom the portion thereof applicable to all-rayon cloth. However, such adjustments were made only in the tax period. From the records available taxpayer's accountant could not and did not determine the pounds or yards or sale value of all-rayon cloth manufactured during the tax period. It can not be said upon the record here before us that his computation of the quantity of all-rayon cloth sold was even approximately accurate. Moreover, sales in pounds of all-rayon cloth in a given period are no measure for the pounds of all-rayon cloth manufactured in the same period, unless it is shown that all the cloth sold was all the cloth manufactured in the same period. Not being able to determine the quantity of rayon consumed *61 in the manufacture of all-rayon cloth in the tax period, no proper apportionment of manufacturing and overhead expenses could be made between the all-rayon cloth and other products manufactured during that period. Reasonable approximations are accepted by the courts. United States v. Arkwright Mills, 139 Fed. (2d) 454. The statements as set up by the taxpayer are not shown to fall within such a category. The burden of proof to establish that it bore the burden of the tax rested upon taxpayer. Section 902 (a) of the Revenue Act of 1936. Webre Steib Co., Ltd., v. Commissioner, 324 U.S. 164; Burnet v. Houston, 283 U.S. 223; Caldwell Sugars, Inc., 2 T.C. 105; affirmed (CCA-5), 140 Fed. (2d) 772. Since the evidence fails to show that taxpayer bore the burden of the tax, the disallowance of the claim for refund by the Commissioner is approved. In view of the above, it is not necessary for us to consider the further contention of the respondent that the taxpayer is not entitled to a refund because it failed to preserve the records necessary to a determination of the extent to which the burden of the tax was shifted, and *62 for failure to furnish to the Commissioner, prior to the date of the disallowance of the claim, the pertinent fact that part of the articles produced by taxpayer consisted of all-rayon cloth, as required by article 702 of Regulations 96. Decision will be entered for the respondent.