The South Coast Corporation v. Commissioner.
South Coast Corp. v. Commissioner
Docket No. 2165.
United States Tax Court
1945 Tax Ct. Memo LEXIS 166; 4 T.C.M. (CCH) 623; T.C.M. (RIA) 45213; June 11, 1945
Samuel E. Blackham, Esq., Samuel J. Sherman, Esq., and Harry Janin, C.P.A., 521 Fifth Ave., New York City, for the petitioner. Sidney B. Gambill, Esq., for the respondent. LEECH
Memorandum Findings of Fact and Opinion LEECH, Judge: The respondent has determined a deficiency of $17,486.78 in unjust enrichment tax for the taxable period beginning October 1, 1935 and ending January 31, 1936. Petitioner claims an overpayment of $36,205.91 in unjust enrichment tax paid by it for such period. The issues are: (1) whether petitioner passed on to its vendees the burden of $72,308.46 in processing taxes imposed but not paid by it and (2) whether it passed on to such vendees the burden of $8,737.11 in processing taxes paid but refunded by its vendor, and is accordingly unjustly enriched to that extent and taxable upon the sum of these two items under section 501 of the Revenue Act of 1936. A preliminary question raised by amended *168 answer filed at the hearing is whether petitioner's margin for comparison with that for the base period under the statute is to be determined upon the basis of the four-month taxable period, October 1, 1935 to January 31, 1936, or upon the fiscal year February 1, 1935 to January 31, 1936, which includes the prior eight-month period of the operations of its predecessor. The respondent in determining the deficiency computed petitioner's margin on the basis of the twelve-month period. By amended answer he contends that the proper basis of the twelve-month period. By amended answer he contends that the proper basis is petitioner's four-month taxable period. Certain of the facts are stipulated by the parties and others established by exhibits and oral testimony introduced at the hearing. We include the stipulation by reference in our findings of fact, but set out only such detail therefrom as is necessary to an understanding of the issues. Those facts set out in our findings which are not included in the stipulation, we find from the evidence. Findings of Fact The South Coast Company (hereinafter at times referred to as the "predecessor") was incorporated under the laws of the State *169 of Delaware in 1927. The petitioner, The South Coast Corporation, was incorporated under the laws of the State of Delaware on July 13, 1935. Petitioner is a corporation with its principal office at New Orleans, Louisiana. The return for the period here involved was filed with the collector for the district of Louisiana. The Federal excise tax on the first domestic processing of direct consumption sugar imposed on petitioner but not paid by it was $72,308.46 for the following periods: Pounds Refined
99.8degree
Tax
November 1935
9,218,000
$ 49,316.30
Less paid on 1/4 pro-
duction
2,304,500
12,329.08
6,913,500
$ 36,987.22
December 1935
9,896,300
52,945.21
January 1-6, 1936
2,282,350
12,210.57
19,092,150
$102,143.00
Less inventory -
January 6, 1936
5,576,550
29,834.54
13,515,600
$ 72,308.46
After passage of Title III of the Revenue Act of 1936, petitioner, on May 15, 1937, duly filed an unjust enrichment tax return for the taxable year ended January 31, 1936 and paid the tax of $27,752.29 computed thereon. Interest in the amount of $693.81 on the above amount was paid on August 9, 1937. Thereafter the Commissioner assessed an *170 additional tax of $8,453.62 which, together with interest in the sum of $770.55, was paid as follows: August 31, 1938
$ 449.40
October 1, 1938
5,000.00
November 1, 1938
3,774.77 Interest of $161.04 on the foregoing installment payments was paid on November 1, 1938. Petitioner executed waiver agreements under which the time for making additional assessments was extended to June 30, 1943, and under such agreements the respondent has asserted the deficiency here in issue. Petitioner on or about May 11, 1940 filed with the collector of internal revenue, New Orleans, Louisiana, a claim for refund of unjust enrichment tax for the year ended January 31, 1936, in the amount of $36,205.91. In June 1930 the predecessor went into receivership in the United States District Court for the Eastern District of Louisiana and thereafter applied for reorganization under the provisions of Section 77B of the Bankruptcy Act. Subsequently a Plan of Reorganization was formulated and presented to and approved by the court. This Plan was dated April 26, 1935 and, under the decree of the court dated September 25, 1935, the petitioner on September 30, 1935, assumed the liabilities and *171 acquired all the assets and properties of the predecessor. The Plan of Reorganization provided for the organization of petitioner, its acquisition of the properties of the predecessor and its assumption of all the liabilities of that company. Under the Plan the petitioner issued both preferred and common stock, each with equal voting rights. Certain shares of this stock were to be issued to the holders of common and preferred stock in the predecessor, and certain shares to some of its creditors. Bonds and notes were also to be issued by the petitioner. Certain definite amounts of these were to be issued in payment of liabilities of the predecessor assumed by petitioner, and the balance, together with such issued stock of the petitioner as was not exchanged for stock in the predecessor corporation, was to be sold to acquire the funds necessary to discharge certain of the obligations of the predecessor directed by the court to be paid in cash. The court, by its final decree, directed that an income tax return be filed by petitioner for itself and the predecessor covering the taxable year February 1, 1935 to January 31, 1936 and that in such return the operations of petitioner and *172 the predecessor be combined as those of one company. The United States was a party to the proceeding in bankruptcy as a creditor and was represented by counsel. It acquiesced in such action and the order of the court. Thereafter a return was duly filed by the petitioner for itself and its predecessor covering the year ended January 31, 1936, in which the operations were combined as directed by the court. Included among the assets which were transferred on September 30, 1935 by the predecessor to the petitioner pursuant to the Plan of Reorganization was the 1935 sugar cane crop. This crop was planted and cultivated by the predecessor but was harvested and processed in part into refined sugar by the petitioner during the period between October 1, 1935 and January 31, 1936. No part of the 1935 sugar cane was harvested, processed into raw or refined sugar, or sold by petitioner's predecessor. The business of the predecessor, and that of petitioner, at all times material to this proceeding as well as prior and subsequent thereto, was the operation of sugar cane plantations in the State of Louisiana, the purchasing of sugar cane, the processing of sugar cane into raw sugar, the purchasing *173 and selling of raw sugar, the processing of raw sugar into refined or granulated sugar, and the selling of refined sugar. At all times material hereto and prior to January 6, 1936, a Federal excise tax was imposed upon the processing of raw sugar into refined sugar. In the Louisiana area sugar cane is planted in August and September, is cultivated in the following spring, and harvesting is begun about October 1 of the year following the year of planting. The petitioner and its predecessor operated four plantations known respectively as Ashland, Terrebonne, Oaklawn and Georgia. In its unjust enrichment tax return hereinbefore referred to, petitioner's net income for the taxable year from the sale of articles on which the Federal excise tax was imposed, as well as its statutory margin, was computed by combining the operations of the predecessor and those of the petitioner for the entire year begun February 1, 1935 and ended January 31, 1936, as though such operations were conducted by one taxpayer. In his notice of deficiency with respect to the contested unjust enrichment taxes, the respondent likewise combined the operations of the predecessor with those of the petitioner for the *174 period from February 1, 1935 to January 31, 1936. In its unjust enrichment tax return, petitioner computed its net income for the taxable period ended January 31, 1936 from the sale of articles with respect to which the Federal excise tax was imposed under section 501 (c) (2) of the Revenue Act of 1936. Petitioner and its predecessor kept their accounts and made their income tax returns on the basis of a fiscal year ended January 31. They also kept their books on an accrual method of accounting and filed their returns on such method. The parties are in agreement that the operations of petitioner's predecessor for the six taxable years preceding the initial imposition of the Federal excise tax are the basis for the computation of the "average margin" for the period here applicable. The average margin for this total base period was.03405004. Petitioner's margin for the period February 1, 1935 to January 31, 1936, was.03149178. The average margin for the base period was in excess of petitioner's margin for the taxable period. The only article sold by the petitioner and its predecessor during the taxable period with respect to which the Federal excise tax was imposed was refined sugar *175 and the only similar articles sold by the predecessor during the six taxable years preceding the initial imposition of the Federal excise tax in question were refined sugar and edible or commercial molasses. The following acreage was cultivated and harvested for the crop years indicated: Crop Year
Acres
1933
10,799
1934
11,613
1935
11,322
1936
11,680
1937
12,112
Included in the cost of each year's harvest was one full year's expense of planting, cultivating and harvesting, without duplication of cost. On February 1, 1935, petitioner's predecessor had an inventory of $5,550,800 pounds of refined sugar from 1934 crop. No additional refined sugar was acquired by the predecessor between February 1 and September 30, 1935. The refined sugar on hand on February 1, 1935 was sold during the months of February to May 1935. Petitioner did not acquire any refined sugar from its predecessor on September 30, 1935. The own-grown cane milled amounted to 209,513 tons for the year ended January 31, 1936 and 767,016 tons for the six base period years. Cane purchased and milled amounted to 151,603 tons in the year ended January 31, 1936 and 488,793 tons for the six base *176 period years. Between June 5, 1934 and June 7, 1934 petitioner's predecessor sold 48,300 pounds of refined sugar at an average price of $4 per cwt. During that period the published price of bone char refined sugar was $4.10 per cwt. On June 8, 1934 petitioner's predecessor had 1,582,800 pounds of refined sugar on hand and it paid a floor stock tax with respect to such sugar. Subsequent to June 8, 1934, petitioner's predecessor refined and sold the raw sugar which it had on hand at that date as follows: Closing
Refined
Sold
Inventory
Period
(Cwt.)
(Cwt.)
(Cwt.)
June 8 to June 30,
1934
68,963
225
84,566
July 1934
69,049
4,481
148,783
August 1934
27,242
121,541
September 1934
43,135
78,406
October 1934
64,072
14,334
November 1934
10,991
3,343
December 1934
1,815
1,528
January 1935
1,528
The average selling price of refined sugar, after eliminating the differential due to bag sizes, was as follows: Selling Price
Selling Price
per Cwt.
per Cwt.
Before Price
After Price
Allowances
Allowances
and Freight
and Freight
Period
Absorption
Absorption
June 22-30, 1934
$4.55
$4.55
July 1934
4.48
4.43
August 1934
4.49
4.43
September 1934
4.47
4.47
October 1934
4.37
4.29
November 1934
4.34
4.19
December 1934
4.15
3.90
January 1935
4.07
3.93
*177 The quantity of refined sugar sold during the period from February 1, 1935 to January 31, 1936, the average selling price per cwt. after eliminating differential due to bag sizes and before price and other allowances and freight absorption, the average selling price per cwt. after allowances and freight absorption, were as follows: Differential
Average
Refined
Gross
Due to
Per Cwt.
Sugar
Date
Sales
Bag Sizes
Balance
Refined
Sold Cwt.
Feb, 1935
$131,896.35
$ 736.55
$131,159.80
$4.10
32,067
March
56,967.85
704.70
56,263.15
4.06
13,854
April
35,077.63
746.15
34,331.48
4.06
8,454
May
1,280.00
33.60
1,246.40
4.10
304
October
88,145.30
916.00
87,229.30
4.90
17,803
November
291,994.90
3,329.70
288,665.20
4.80
60,132
December
363,614.92
4,415.45
359,199.47
4.65
77,154
Jan. 1-6, 1936
118,034.70
1,500.15
116,534.55
4.65
25,064
January 7-31
304,212.30
4,169.15
300,043.15
4.49
66.854
Average
Per
Allowances
Guarantee
Cwt. After
and Freight
Price and
Allowances
Absorption
Other
Freight
and
Date
Per Cwt.
Total
Allowances
Absorption
Absorption
Feb. 1935
$.07
$2,332.77
$1,684.07
$ 648.70
$4.03
March
.03
401.74
175.95
225.79
4.03
April
.06
548.44
127.48
420.96
4.00
May
October
.05
798.47
798.47
4.85
November
.06
3,509.22
835.90
2,673.32
4.74
December
.12
9,287.32
6,114.18
3,173.14
4.53
Jan. 1-6, 1936
.09
2,314.54
1,308.68
1,005.86
4.56
January 7-31
.09
6,209.64
3,490.69
2,718.95
4.40
*178 The published market prices for refined sugar per 100 pounds from June 8, 1932 to October 12, 1936 were as follows: 1932
June 8-June 15
$3.70
June 16-June 19
3.80
June 20-July 10
3.90
July 11-July 17
4.00
July 18-August 11
4.10
August 12-August 17
4.15
August 18-October 2
4.25
October 3-October 16
4.15
October 17-November 27
4.25
November 28-December 31
4.15
1933
January 1-January 3
4.15
January 4-January 8
4.00
January 9-January 17
3.95
January 18-March 7
3.90
March 8-March 21
4.10
March 22-April 19
4.20
April 20-April 22
4.30
April 23-June 7
4.50
June 8-July 12
4.60
July 13-September 20
4.70
September 21-November 8
4.60
November 9-December 7
4.50
December 8-December 18
4.40
December 19-December 31
4.30
1934
January 1-February 10
4.30
February 11-April 17
4.50
April 18-May 3
4.30
May 4-May 22
4.20
May 23-June 7
4.10
June 8-June 24
4.65
June 25-October 1
4.75
October 2-November 8
4.65
November 9-December 2
4.50
December 3-December 20
$4.40
December 21-December 31
4.30
1935
January 1-February 10
4.30
February 11
4.25
February 12-March 24
4.30
March 25-March 26
4.50
March 27-March 28
4.70
March 29-April 22
4.90
April 23-April 28
5.10
April 29-July 17
5.25
July 18-July 22
4.90
July 23-September 22
5.10
September 23-November 26
5.30
November 27-December 2
5.10
December 3-December 15
5.00
December 16
4.90
December 17-December 22
5.00
December 23-December 31
4.90
1936
January 1-January 5
5.00
January 6-January 27
4.75
January 28-March 2
4.65
March 3-March 4
4.55
March 5-March 10
4.65
March 11-March 24
4.75
March 25-March 30
4.85
March 31-July 9
5.00
July 10-August 23
4.75
August 24-September 14
4.65
September 28-October 12
4.72
*179 Pursuant to the Plan of Reorganization the petitioner issued 164,379.5 shares of common stock and 25,405.1 shares of preferred stock. All of the shares had similar and full voting power of one vote for each share. The treatment of creditors and stockholders of the predecessor as carried out under the Plan of Reorganization is summarized in the following table: Creditors and Security-Holders
Amount of
Treatment Under Plan of
of Predecessor Corporation
Indebtedness
Reorganization
(1) Bondholders
$1,250,000.00
(1) Received General Mortgage Bonds
of the Petitioner in the ratio of
$600.00 principal amount for each
$500.00 principal amount of old
bonds, together with all unpaid
interest coupons attached.
(2) Wage Claimants
18,410.59
(2) 25% payable in cash and 75% in
General Mortgage Bonds of Peti-
tioner or all cash at option of
claimant.
(3) Claims secured by liens upon ma-
(3) 25% payable in cash and 75% in
chinery, equipment, etc.
90,854.67
General Mortgage Bonds of Peti-
tioner.
(4) Crop lien claims
416,965.49
(4) Received General Mortgage Bonds
and interest thereon of
56,706.83
of Petitioner in the principal
amount of $263,120.00 and Pre-
ferred Stock of Petitioner of the
par value of $210,550.69.
(5) Ordinary unsecured claims
2,329,950.00
(5) Received Preferred Stock of Peti-
tioner of par value of $2,329,950.00.
(6) Federal, State and local taxes
116,775.36
(6) $116,775.36 in cash paid by Peti-
tioner to Trustees to discharge
tax claims to the extent deter-
mined to be valid and exigible.
(7) Compensation and disbursements al-
(7) $229,152.72 in cash and 25,500 shares
lowed to receivers, trustees, attor-
of Common Stock of Petitioner
neys, reorganization committees,
delivered to Trustees for this pur-
etc., pursuant to order of District
pose.
Court dated August 12, 1935
229,152.72 plus
(8) Preferred Stock
12,061 shares
(8) Received 3 1/2 shares of Common
Stock of Petitioner for each share
of old preferred stock held.
(9) Common Stock
151,063 shares
(9) Received 1 share of common stock
of Petitioner for each 9 shares of
old common stock held.
*180 The stock of petitioner was issued as shown by the following table: Number of New Shares Issued by Petitioner
Shares
Stockholders and
Issued to
Creditors of
Total
Stockholders
Predecessor
Shares
Stock
of Old Corporation
Explanation
Issued
Issued
Corporation
Preferred stockholders
3 1/2 shares of new common is-
sued for each share of old
preferred
41,993
Common
41,993
Common stockholders
1 share of new common issued
for each 9 shares of old
common
16,886.5
Common
16,886.5
Preferred and common
Pursuant to subscription rights
stockholders
granted to old preferred and
common stockholders
18,288
Common
18,288
Phoenix Securities Cor-
Pursuant to underwriting
poration
agreement to take up any
shares of stock not sub-
scribed for by old stock-
holders
41,712
Common
41,712
Phoenix Securities Cor-
For services as underwriter
20,000
Common
20,000
poration
Receivers, Trustees, mem-
For services pursuant to Ar-
bers of Bondholders'
ticle XXII of Decree of the
Committee, Reorgani-
District Court dated Septem-
zation Committee, etc.
ber 25, 1935
25,500
Common
12,000
Crop lien claimants
On account of claims secured
by liens upon crops or crop
funds of predecessor corpo-
ration
2,105.6
Preferred
2,016.4
Ordinary unsecured
For claims against predeces-
claimants
cessor corporation
23,299.5
Preferred
18,072.7
Total new shares issued by petitioner
189,784.6
170,968.6
Percentage of total new shares issued by Petitioner to stockholders of
predecessor corporation
90.1%
*181 Of the 61,712 shares of petitioner's common stock issued to Phoenix Securities Corporation pursuant to the underwriting agreement, 37,945 shares were transferred by Phoenix Securities Corporation to Central Securities Corporation on February 29, 1936. This transfer was not a part of the Plan of Reorganization, but was a voluntary contribution, without consideration, to the capital of Central Securities Corporation, which was a wholly owned subsidiary of Phoenix Securities Corporation. Blackstrap molasses is derived from the grinding of sugar cane into raw sugar and from the refining of raw sugar into refined sugar. Approximately 86 per cent of the total yield of blackstrap molasses is derived from the initial process of melting cane into raw sugar. Bagasse is the residue left from sugar cane after it has been processed into raw sugar. Sales by petitioner of blackstrap molasses subsequent to September 30, 1935 and prior to January 31, 1936 amounted to $104,345.65. Blackstrap molasses sold was derived from the processing at and said sales are attributable to the following plantations: Georgia
$ 37,749.16
Terrebonne
17,752.28
Oaklawn
48,844.21
Total
$104,345.65
*182 Sales by petitioner of bagasse subsequent to September 30, 1935 and prior to January 31, 1936 amounted to $99,679.76. Bagasse sold was derived from the processing at and said sales are attributable to the following plantations: Georgia
$30,957.06
Terrebonne
39,040.35
Oaklawn
29,682.35
Total
$99,679.76
Inventory of unsold blackstrap molasses at January 31, 1936 valued at market value was $37,729.80, which was derived from processing at and is attributable to the following plantations: Georgia
$ 9,289.38
Terrebonne
24,968.10
Oaklawn
3,472.32
Total
$37,729.80
No part of the sales of blackstrap molasses and bagasse and of the blackstrap molasses inventory at January 31, 1936 is includible in determining the net income from the sale of articles with respect to which the Federal excise tax was imposed. Petitioner's predecessor, as a producer of sugar cane, entered into a sugar cane production adjustment contract under the Agricultural Adjustment Act, as amended. Thereafter, there having been duly executed a certificate of compliance and a certificate of performance, the United States made benefit payments under this contract. Petitioner, *183 in acquiring the assets of the predecessor under the reorganization, took over the right to receive benefit payments which should become due. During the period from September 30, 1935 to January 31, 1936, petitioner actually received benefit payments aggregating $74,671.23, representing advance 1935 payments, pursuant to section 16(a) of the Sugar Cane Production Adjustment Contracts. Final 1935 payments, pursuant to section 16 (b) of said contracts, in the amount of $59,328.68, were received by petitioner subsequent to January 31, 1936. All of the contracts for benefit payments were entered into by petitioner's predecessor and were dated prior to January 31, 1935 except one contract which was dated February 8, 1935. There was no curtailment of production during the crop years 1934, 1935 and 1936. No planted acreage was plowed under. There was no payment to the Secretary for excess sugar cane, in accordance with section 6 of the contract. The contracts did not require the petitioner to purchase cane and/or raw sugar, or to sell cane, or to purchase refined sugar. Petitioner and its predecessor sold no sugar cane. Petitioner did not treat benefit payments as a reduction of cost *184 in its books of account and in its published reports to stockholders. These payments received by petitioner and its predecessor were not considered in evaluating inventory of raw and refined sugar at beginning and end of the taxable year. They are allocable to specific plantations. These payments are payable only to a producer. No benefit payments were received with respect to raw sugar purchased from others. All sugar cane purchased from outside growers was acquired during the period from September 30, 1935 to January 31, 1936 and no benefit payments were received with respect to such purchases. Benefit payments are made upon the basis of cane grown, regardless of whether such cane is ultimately processed into refined sugar. They do not constitute gross income from the sale of the articles with respect to which the Federal excise tax was imposed. During the entire period from September 30, 1935 to January 31, 1936, petitioner operated six general merchandise stores which were engaged in the selling of groceries, dry goods, notions and other wares. For a great many years prior to September 30, 1935, petitioner's predecessor operated the said stores in the same manner as the petitioner *185 herein. These stores were located at or between the various plantations of the petitioner and were operated not as a branch of its plantation, factory or refining operations but as an independent business enterprise. The stores were operated throughout the entire year and were not dependent upon the refining operations of the petitioner or its predecessor. Over the period of their operations, the stores had been a profitable investment for the petitioner and its predecessor. These stores were in competition with other stores in the vicinity that were independently owned and with truck peddlers and the prices charged in these stores were comparable with prices charged at competing stores. They were patronized by employees of petitioner as well as others who were not employees and the prices charged were the same for both. Employees of the petitioner and its predecessor were not compelled to patronize the stores and the operation of the stores was not held out as an inducement to employment. Employees of the petitioner and its predecessor were permitted to purchase merchandise from the stores for cash, credit and upon coupons issued as wage advances. Customers who were not employees *186 were extended credit if they were known in the vicinity. The smaller stores were operated by a manager and a clerk while the larger stores had a manager, assistant manager and two or three clerks all of whom devoted their full time to the operation of the stores. When sugar was billed by the petitioner and its predecessor to the stores, it was billed at the same price as to other purchasers. The stores also purchased sugar for retail sale from others than the petitioner and its predecessor. The profit from store operations is not includible in determining the net income from the sale of articles with respect to which the Federal excise tax was imposed. In Item 13 of the income tax return covering the period February 1, 1935 to January 31, 1936, there was reported "other income" of $112,096.09, representing the following: United States cane benefit payments
$ 74,671.23
Profit on bonds purchased for sinking
fund
17,759.64
Miscellaneous income
19,665.22
Total
$112,096.09
Miscellaneous income comprised the following: Fees for permitting fur trapping
$ 1,950.66
Rentals of equipment - boats, barges,
etc. to others
5,373.75
Rent of locomotives
525.87
Sales of hogs, scrap iron, etc.
8,064.32
Adjustment of prepaid insurance as at
January 31, 1935
2,831.13
Return of cash deposited March 27,
1931 in eminent domain proceedings
217.00
Profit on sale of equipment
459.42
Miscellaneous income
243.07
Total
$19,665.22
*187 The items of miscellaneous income, hereinabove listed, were never set up on the books of the petitioner or its predecessor as a reduction of the cost of sugar. Fees for permitting fur trapping represent amounts received for uncultivated swamp lands leased to commercial trappers. There was no relation between income received for equipment rented to others and rentals paid for equipment rented from others. Petitioner did not raise hogs on its plantations. Such hogs as petitioner had were not fed with produce from farming operations. Income from the sales of hogs and of scrap iron would have been received by petitioner regardless of refining operations. The items of miscellaneous income, set out above, do not constitute gross income from the sale, or a reduction of the cost of articles with respect to which the Federal excise tax was imposed. On January 29, 1936 petitioner purchased its own bonds, of a par value of $46,400, for the sum of $28,640.36. The difference between the par value and the purchase price, or $17,759.64, does not constitute gross income from the sale of articles with respect to which the Federal excise tax was imposed and is not a reduction of the interest *188 expense on the remaining outstanding bonds of the petitioner. The predecessor's actual selling price of refined sugar during the period from June 5 to 7, 1934 was lower than the published price by $.10 per cwt. Petitioner sold its refined sugar below published prices at differentials between $.43 and $.53 per cwt. in November 1935 and $.35 and $.45 in December 1935. Of the 13,515,600 pounds of refined sugar sold on which no tax was paid, 6,913,500 pounds relate to the month of November 1935. The balance of refined sugar, i.e., 6,602,100 pounds, relates to the month of December 1935. Petitioner's own processed raw sugar cost an average of $.0270135 per pound. It purchased 5,272,144 pounds of raw sugar during the taxable year at an average cost of $.0319739 per pound which was $.0049604 per pound in excess of the cost of its own home-grown raw sugar. Petitioner's predecessor, during the base period, did not purchase any raw sugar. None of the net income of petitioner for the taxable year from the sale of refined sugar, with respect to which the Federal excise tax was imposed but not paid, was attributable to petitioner's shifting such tax to any extent to others. Petitioner and *189 its predecessor used large cotton bags as containers for the shipment of refined sugar which they sold. They did not sell cotton bags separately as such. A processing tax was imposed on cotton on August 1, 1933. On or about June 13, 1934 the processing tax on large cotton bags was suspended by a certificate issued by the Secretary of Agriculture. After the latter date, bag manufacturers continued to accept from the mills deliveries of cotton cloth on which the processing tax had been paid. The manufacturers of cotton bags continued to include processing taxes in their invoices to the users of the large cotton bags, such as petitioner and its predecessor, with the provision that the users of such bags would be reimbursed for the tax after the bag manufacturers had received refund from the government therefor. Petitioner and its predecessor were so billed and subsequently received refunds and credits. The amounts of reimbursements received by petitioner and its predecessor and the periods to which such reimbursements are allocable are as follows: Period to Which Reimbursements
Period in Which Reimbursement
Are Applicable
Amount
Was Received
(Dates of Invoices for Bags)
Received
July 16, 1935 to September 25, 1935
July 17, 1934 to October 31, 1934
$1,047.15
November 25, 1935 to January 15, 1936
November 6, 1934 to January 17, 1935
1,902.86
July 25, 1936 to October 27, 1936
October 17, 1935 to January 6, 1936
(Fulton Bag)
2,302.71
(Mente)
1,052.15
October 14, 1936 to November 5, 1936
June 18, 1934 to December 29, 1934
1,560.89
January 7, 1936 to January 15, 1936
January 7, 1936 to January 15, 1936
871.35
$8,737.11
*190 After the tax on large cotton bags was suspended, entries were made on petitioner's books to eliminate from cost the processing tax on such bags. The refunds due from the bag manufacturers were taken up in income as accounts receivable by its predecessor and petitioner when billed for purchases. When payment was later made by the bag manufacturers the amount thereof was credited against the accounts receivable. These unpaid accounts receivable of the predecessor were taken over by petitioner as an asset in the 77B reorganization. Petitioner did not bear the burden of, and shifted to its vendees, the Federal excise tax burden with respect to large cotton bags to the extent of $3,354.86. Opinion In accordance with the provisions of Title III of the Revenue Act of 1936, petitioner filed an unjust enrichment tax return for the taxable period beginning October 1, 1935 and ending January 31, 1936. It reported thereon additional income subject to unjust enrichment tax, upon which income it computed and paid an unjust enrichment tax of $27,752.29. On audit of this return, respondent increased such income upon which he assessed additional unjust enrichment taxes in the amount of $8,453.62, *191 which petitioner paid, together with interest thereon. Thereafter, on May 11, 1940, petitioner filed a timely claim for refund of the total amount of such taxes paid by it, in the amount of $36,205.91. Upon audit of this refund claim, respondent again increased petitioner's income subject to unjust enrichment taxes to $81,045.57. Thereupon he determined the pending deficiency of $17,486.78 in unjust enrichment taxes for the taxable period October 1, 1935 to January 31, 1936. There are two items making up the total of $81,045.57, alleged income subject to such taxes, upon which the contested tax was computed. One item consists of asserted unjust enrichment income in the amount of $72,308.46 in the form of processing taxes in this amount imposed upon but not paid by petitioner for the processing of refined sugar during the tax period and which taxes, respondent avers, were passed on by petitioner to its vendees. The tax on this item of income is proposed under section 501 (a)(1) of the Revenue Act of 1936. Petitioner sold its refined sugar in large cotton bags. It purchased these bags from vendors who had paid processing taxes upon the processing of the cotton into the cloth from *192 which the bags were made. These taxes were included in the price petitioner paid for the bags. Respondent asserts that this tax in the above amount of $8,737.11, refunded to petitioner by its vendors, was passed on to its vendees during the taxable period. He has thus increased petitioner's income subject to unjust enrichment tax by the amount of $8,737.11. This constitutes the second item of alleged unjust enrichment income upon which the disputed taxes were determined. The tax on this second item of income is proposed under section 501 (a)(2) of the same Revenue Act. Petitioner took over the assets of the predecessor and began operations on October 1, 1935. It continued the operation of the business for the fiscal year February 1, 1935 to January 31, 1936. The decree of the United States District Court approving the reorganization under section 77B of the Bankruptcy Act specifically directed that taxes due the United States be computed for this entire fiscal year covering the operations of the predecessor and of petitioner as if such operations were those of one company. This direction was followed. In originally determining the deficiency respondent made his computation of petitioner's *193 net income from the sale of articles upon which the tax was imposed, as well as its statutory margin, upon the basis of the full fiscal year, as did petitioner in its unjust enrichment tax return as set out in the findings. Respondent, however, by amended answer filed at the hearing, changed the basis of his computation. He there alleged that he was in error in using the entire fiscal year and the operations of both petitioner and its predecessor. The new basis for computation is the short period beginning with the operations of petitioner on October 1, 1935 and ending with the close of the fiscal year on January 31, 1936. This change is premised upon the position now taken by respondent that the reorganization effected under section 77B of the Bankruptcy Act was taxable in character, that petitioner must be treated as having purchased the assets of the predecessor, that the cost to petitioner and not to the predecessor is to be used in determining income from the sale of articles upon which the processing tax was imposed and, consequently, that the computation of petitioner's margin must be made upon the basis of the operations of only the four-month period of the fiscal year in *194 which petitioner operated. Since this position of the respondent results in a substantially different margin computation and its correctness is disputed by petitioner, the question of the validity of this position must first be answered. Petitioner contends that the reorganization of the predecessor corporation was nontaxable because it was within the purview of the definition contained in Clause (C) of section 112 (g) (1) of the Revenue Act of 1934 as amended by section 213 (g) (1) of the Revenue Act of 1939. [1]
Under the plan of reorganization as carried out, 90.1 per cent of petitioner's preferred and common stock, both classes having equal voting rights, was issued to *195 stockholders of the old company. Some of this stock was issued in exchange for the surrender by such stockholders of their stock in the predecessor and the remainder was issued for services and other considerations. Respondent does not contend that the stock issued to the old stockholders for considerations other than the surrender of their old stock is not to be included in determining the question of control under the cited section. See Commissioner v. Huntziger et al., 137 Fed. (2d) 128, and Prairie du Chien-Marquette Bridge Co. v. Commissioner, 142 Fed. (2d) 624. He argues only that the transaction does not qualify by reason of the fact that there should be eliminated from the total of petitioner's common stock issued to the old stockholders 37,945 shares out of a total 61,712 shares issued to the Phoenix Securities Corporation. These 37,945 shares were transferred by Phoenix Securities Corporation, after it received them, to Central Securities Corporation, a wholly owned subsidiary. The facts were that Phoenix Securities Corporation was a stockholder of the predecessor corporation and was employed under an underwriting agreement in the plan of reorganization *196 to dispose of certain collateral notes issued by petitioner under that plan, together with shares of common stock of petitioner. They were to be sold in certain units to preferred and common stockholders of the predecessor. The underwriter agreed to subscribe to such of the units as were not thus sold. Under such commitment it acquired individually 41,712 shares of petitioner's common stock. In addition it received 20,000 shares of petitioner's common stock as compensation for its service as underwriter. Of this total of 61,712 shares of common stock of petitioner, 37,945 shares were transferred by Phoenix Securities to Central Securities on February 29, 1936. Respondent's contention that the common stock so transferred by Phoenix Securities to its subsidiary should be eliminated from the total issued to it in determining the question of control, is based upon the fact that although no written contract to that effect existed Phoenix Securities had an understanding, with its wholly owned subsidiary, Central Securities, to transfer to the latter 62 1/2 per cent of whatever common stock it might acquire from petitioner. It is argued by respondent that under the rule laid down in Heberlein Patent Corp. v. United States, 105 Fed. (2d) 965; *197 Hazeltine Corporation v. Commissioner, 89 Fed. (2d) 513; Bassick v. Commissioner, 85 Fed. (2d) 8; and Halliburton v. Commissioner, 78 Fed. (2d) 265, the 62 1/2 per cent, or 37,945 shares of the stock of petitioner thus received by Phoenix may not be considered as stock of Phoenix in resolving the question of control of petitioner under the statute. The basis for the argument is the fact that in the "Introductory Statement" to the Plan of Reorganization, there appears a sentence reading: * * * Of the New Common Stock to be received by the Underwriter under the Underwriting Agreement, 62 1/2% will be turned over by the Underwriter to Central Securities Corporation. We do not agree with respondent's contention. There is no suggestion that Central Securities was a party in any way to the reorganization or performed any services in connection therewith. The underwriting agreement which sets out the obligation of Phoenix Securities Corporation includes no mention of Central Securities. It puts upon Phoenix no obligation to make a transfer of petitioner's stock to Central. Moreover, there is no fact or circumstance indicating a basis of an interest *198 of any kind on the part of petitioner, its stockholders, the predecessor or its stockholders or creditors, in whether Phoenix should or should not make the transfer to Central. The latter corporation is a wholly owned subsidiary of Phoenix. There is no doubt that Phoenix had planned, prior to receipt of the stock, to transfer the stated percentage to such subsidiary as a voluntary contribution to its capital. But we are unable to find anything in the record which indicates a binding obligation upon Phoenix to make such transfer. We think that Phoenix, upon receipt of petitioner's stock, was at liberty either to keep or transfer the shares to its subsidiary. The lack of any obligation upon Phoenix to transfer the stock existing at the time of its issue renders inapplicable the rule announced in the above cited cases. We have recognized this exception under substantially similar circumstances. In Wilgard Realty Co. v. Commissioner, 43 B.T.A. 557; affd., 127 Fed. (2d) 514, the recipient of stock made a gift of a part thereof in carrying out a prior conceived plan. In that case we refused to consider the acquisition of the stock and its immediate transfer as *199 one transaction. In affirming our decision and rejecting the claim that under such circumstances the rule in the Bassick and other such cases applied, the Circuit Court of Appeals for the Second Circuit said: Though it was plainly enough Mr. Chamberlin's intention to create the petitioner and to transfer his property to it for its stock and the assumption of his liability on the two mortgages in order to provide him with stock to give as he did to his relatives, he was under no obligation to make the gift. There is neither claim nor proof that he was bound to carry out his intention to give any of it away when he received the stock or that he was not free at any time up to the very moment he gave it away to change his mind and use it for any lawful purpose. This would, of course, include the use of it to control the petitioner for as long as he desired by virtue of stock ownership far in excess of the 80 per centum made enough under the statutory definition of control found in Section 112 (h) of the Act. We hold that Phoenix, upon receipt of petitioner's stock, was free to change its plan for a voluntary transfer of a prt of such stock to its subsidiary and to retain and use all *200 of such stock for any purpose. It follows that for the purposes of statutory control the entire 61,712 shares received by Phoenix should be treated as belonging to it. Accordingly we have found that the stock ownership of 90.1 per cent of petitioner's issued stock remained in the stockholders of the predecessor. We conclude that the requirements of Clause (C), supra, are met and that the transaction in question was a nontaxable reorganization. In view of that conclusion it necessarily follows that we must reject respondent's computation of petitioner's "margin", under section 501 (f) of the Revenue Act of 1936, because in such computation the cost to petitioner of the growing sugar cane crop acquired from its predecessor has been included on the basis of market value instead of cost to the predecessor. Moreover, the computation of such "margin" by respondent, as well as the computation of an "average margin" for the base period, for the purpose of comparison required by the statute, is, in our opinion, incorrect in several respects. In its operations in the taxable period petitioner bought large quantities of raw sugar at a cost which is not in dispute. Respondent, however, instead *201 of using such cost for purposes of the "margin" computation has used a theoretical cost consisting of the market value of the sugar cane necessary to have produced such raw sugar as if petitioner had purchased the cane and milled it into raw sugar instead of purchasing such sugar from other mills. We think this was clearly in error since in the computation petitioner is entitled to use the actual cost of the materials. The article manufactured and produced by the petitioner upon which the processing tax was imposed was refined sugar. The materials entering into the production of such article were sugar cane produced by petitioner, sugar cane purchased from others by petitioner, and the raw sugar purchased by petitioner. For purposes of "margin" computation, we see no reason in the case of a "purchased article" such as raw sugar to use any figure other than the actual amount which petitioner paid for that material. See Standard Knitting Mills, Inc., 47 B.T.A. 295. We agree with petitioner that in the "average margin" computation made by respondent upon base period operations of the predecessor corporation, the proceeds of sales of articles produced should include the *202 proceeds of sales of commercial molasses, since such product is one upon which the excise tax is imposed. This production was omitted by respondent upon the ground that in the taxable period petitioner consumed all of its raw sugar in the production of refined sugar and produced no commercial molasses. Had it produced molasses, however, such product would have been subject to the processing tax and would have been expressed in units of raw sugar just as was the refined sugar. We think that the elimination of sales of commercial molasses, in the base period, distorts the comparison since during that period a large portion of the predecessor's production was of this type of article, similar to refined sugar in that it was an article of final process for human consumption with respect to which an excise tax would be imposed. This brings us to the question of the basis of computation of petitioner's "margin" for the taxable period. In his computation respondent has used only the four-month period closing the fiscal year ending January 31, 1936. This has been done upon the theory expressed in his amended answer, i.e., that petitioner acquired the assets of the predecessor by purchase *203 in a taxable transaction. Petitioner contends, on the other hand, that the computation of its "margin", in order to be fair and correct under the circumstances, must be made upon the basis of the full year. The situation here is unusual. The factor to be computed is one for comparison with the average over a prior term. Petitioner, as we have held, acquired the assets of the predecessor in a nontaxable reorganization in which it has taken the properties, including growing crops, at their cost to the predecessor who, for prior years, has consistently computed income upon a crop basis. The difficulty in segregating the final detail of operations of the petitioner from those of the predecessor was apparently recognized by the court in the proceeding under 77B of the Bankruptcy Act. The order of that court thus specifically directed that the taxes due the government from the predecessor corporation and petitioner for the year ending January 31, 1936 be computed upon a "crop basis" of accounting as if petitioner and its predecessor were one corporation. Petitioner argues that this order of the court is binding and requires that in the computation of petitioner's "margin" and profit *204 from the sale of articles with respect to which the excise tax was imposed, the full year be used and the crop basis of accounting be employed. It is urged that the decree setting out this order is specific; that the court's jurisdiction to enter such an order is unquestioned; that the United States was a party to the proceeding in bankruptcy, acquiesced in the order as made, and has not questioned the computation of income taxes made by the petitioner in accordance therewith. Petitioner asserts that to permit respondent to disregard the order is in effect a collateral attack thereon. Whether the order of the court makes it mandatory that the computations of profit or "margin" for purposes of computing an unjust enrichment tax be made upon the basis of the full year, we find it unnecessary to decide. The question here is the proper computation of "margin" of profit. That computation is not the actual profit but a figure computed upon the basis of certain limited statutory factors. It is not a profit which takes into consideration all costs. Rather it is restricted by statute to the difference between costs of materials entering into and the selling price of the article upon which *205 the tax is imposed. It is to be used merely for comparison with the average of a similarly computed "margin" over a base period of prior operations. The purpose of these "margin" computations is manifestly to obtain a fair comparison between the tax period and an average of the periods prior to the imposition of such tax. On this record, including the acquisition by the petitioner of the properties of the predecessor with assumption of its liabilities in a non-taxable reorganization and the consequent taking by petitioner of the basis of its predecessor for gain or loss; the consistent accounting on a crop basis with a cost of planting and cultivating the crop in the year of planting reflected as an item of cost in the following year of harvest; and the fact that the "crop basis" of accounting for the accurate reflection of income for tax purposes has long been recognized in the law, ( Kahuku Plantation Co., 12 B.T.A. 977; modified, 13 B.T.A. 292; acq. VII-2 C.B. 21; Regulations 86, arts. 22 (a)-7, 23 (a)-11), we think it is essential, in order to avoid distortion of the comparison, to compute the margin for the taxable period upon the basis of the full *206 fiscal year ending January 31, 1936. It is upon this basis that the petitioner has computed its "margin" for the taxable period. It introduced in evidence two margin computations for the base period and the taxable period. In the first of these computations it included in cost for both periods the price paid by the taxpayer for "purchased cane" but has excluded the cost to the taxpayer of own-grown cane harvested and used in the production of its refined sugar. In this computation petitioner also eliminated sales of bagasse and blackstrap molasses. The second computation is made upon the same basis except that petitioner's cost for own-grown cane and its sales of bagasse and blackstrap molasses are included. Under both computations the "average margin" for the base period exceeded that of the "margin" for the taxable period. Petitioner contends that its first computation is correct. We do not agree. The statute specifically requires the use of cost of material entering into the articles upon which the tax is imposed. We see no distinction between materials purchased for money by the taxpayer and similar materials produced by him at a definite cost. We disagree also with petitioner's *207 contention that in the computation of the "margin", sales of bagasse and blackstrap molasses should not be reflected. It is true that these are both by-products and are not articles upon which the tax is imposed. They are, however, produced from the materials, the cost of which has been included in the computation. Admittedly the profit upon sales of blackstrap molasses and bagasse does not constitute profit from the sale of articles upon which the tax is imposed. This fact, however, does not mean that this profit should not be reflected in the computations of the "margin" for the purpose of comparison as provided by the statute. Webre Steib Co. Ltd. v. Commissioner, PTBR Docket No. 389, November 24, 1942, reversed on other grounds, 324 U.S. 164, (Feb. 12, 1945). As heretofore stated, petitioner's second computation differs from the first only in its inclusion of sales of blackstrap molasses and bagasse and the cost to petitioner of its own-grown cane. We think that this computation is correct and have accordingly found that the "margin" for the base period was.03405004 and for the taxable period.03149178. The effect of our foregoing conclusion is that the presumption *208 of correctness attaching to the respondent's determination of the deficiency is changed to a presumption that the petitioner absorbed the tax imposed. That presumption is not evidence per se. But because of it, in order to support his determination the respondent was required to come forward and show that the tax has, in fact, been passed on by the petitioner. Section 501 (e) (2) of the Revenue Act of 1936. Webre Steib Co., Ltd. v. Commissioner, 324 U.S. 164, (Feb. 12, 1945). Section 501 (i) (2) of the same Revenue Act provides that such proof may include, but shall not be limited to: (2) Proof that the taxpayer modified contracts of sale, or adopted a new contract of sale, to reflect the initiation, termination, or change in amount of the Federal excise tax, or at any such time changed the sale price of the article (including the effect of a change in size, package, discount terms, or any other merchandising practice) by substantially the amount of the tax or change therein, or at any time billed the tax as a separate item to any vendee or indicated by any writing that the sale price included the amount of the tax, or contracted to refund any part of the sale price *209 in the event of recovery of the tax or decision of its invalidity; but the taxpayer may establish that such acts were caused by factors other than the tax, or that they do not represent his practice during the period in which the articles in question were sold. Although respondent is not limited to proof of the facts set out in the foregoing subsection, it is evident that they constitute substantially all the facts which would tend to show that petitioner, in fact, passed on the burden of the tax to its vendees. Here respondent has offered evidence of only one fact among those listed in the quoted subsection and the proof of this is to some extent qualified. The evidence is that petitioner's predecessor sold its product on the Louisiana market and that this market raised prices immediately following the imposition of the tax by 55 cents per 100 pounds on refined sugar which, when adjusted by allowances, equaled an increase of 53 1/2 cents per 100 pounds, which was the amount of the tax imposed, and that the predecessor sold refined sugar at the increased price. Petitioner, however, was not in existence at the time of the imposition of the tax. It came into being the following year *210 and sold its refined sugar upon the market then existing. Under these conditions, even if the market at the time petitioner came into existence was as high or even higher than the figure to which it moved at the time of the imposition of the tax, that fact, we think, is rather attenuated evidence in the present picture, at least, that such higher level was due to the passing on to the purchaser the burden of the tax rather than to other intervening causes. It must be remembered that fluctuations in price of refined sugar are due to many causes other than tax imposition. The evidence is further that although petitioner's predecessor, upon the imposition of the tax on June 8, 1934, did increase its price correspondingly, it was able to sell and sold only a small amount of sugar at the increased price prior to June 22, 1934, although it had on hand at that time an inventory of 1,582,800 pounds of refined sugar. There is no evidence that petitioner ever modified contracts of sale or adopted a new contract of sale to reflect the initiation, termination or change in the amount of the Federal excise tax; at any time billed the tax as a separate item to any vendee or indicated by any writing *211 that the sales price included the amount of the tax, or contracted to refund any part of the sales price in the event of the recovery of the tax or a decision of its invalidity. Respondent does not claim that any of these things was done by petitioner. In addition to his proof as to the price increase by petitioner's predecessor, respondent did introduce one more item of proof which, it is argued, tends to show that petitioner did not absorb the tax but passed it on. This evidence is that petitioner maintained on its books an account entitled "Processing Taxes", in which was recorded its liability for such tax and payments thereon. Against this evidence of respondent is the favorable "margin" comparison of petitioner, which must be considered regardless of whether the presumption favoring petitioner based on those margins has been eliminated. Webre Steib Co., Ltd. v. Commissioner, 324 U.S. 164, (Feb. 12, 1945). Moreover, and of significance, the total of processing tax, imposed but not paid, is $72,308.46. Of the 13,515,600 pounds of refined sugar sold on which no tax was paid, 6,913,500 were sold in the month of November 1935, at a price $.43 per cwt. below the published *212 market price. This evidenced an absorption of the tax to the extent of $29,728.05 (69,135 x $.43). The balance of 6,602,100 pounds (13,515,600 minus 6,913,500) was sold at a similar differential of $.35 per cwt., thus indicating an absorption of the tax to the extent of $23,107.35 (66,021 x $.35). The petitioner purchased 5,272,144 pounds of raw sugar at a cost of $.0049604 per pound over the cost of its own processed raw sugar, indicating an increased cost of $26,151.94 (5,272,144 x $.0049604). These amounts, i.e., $29,728.05, $23,107.35 and $26,151.94 total $78,987.34, an excess of $6,678.88 over the total tax of $72,308.46. Thus if the increase in the selling price is evidence that the tax was passed on, as is provided in section 501 (i) (2), supra, it logically follows that a decrease in the selling price or increased cost indicates an absorption of the tax to that extent. United States v. Arkwright Mills, 139 Fed. (2d) 454; Helvering v. Insular Sugar Refining Corp., 141 Fed. (2d) 713. Therefore assuming that the respondent's proof that petitioner's predecessor at the time of the original imposition of the processing tax increased its price in an amount *213 sufficient to cover the tax, together with the proof that petitioner kept a book account recording the processing taxes, is sufficient to dissolve the statutory presumption in petitioner's favor, thus shifting the burden back to petitioner, on the entire record we think petitioner has established that during its taxable period it absorbed the contested processing tax on refined sugar sales. The remaining issue is upon that portion of the deficiency in unjust enrichment taxes computed by respondent upon his determination that certain stipulated refunds received by petitioner from certain of its vendors of large cotton bags represented cotton processing taxes passed on by these vendors to petitioner and in turn passed on by petitioner to its vendees in the price charged for its bagged sugar. The respondent originally determined that petitioner had received reimbursement on cotton bags purchased in the amount of $8,737.11. On brief the respondent concedes that the sum of $871.35 was on bags purchased by petitioner subsequent to January 6, 1936 and should be eliminated. He concedes also that the further sum of $1,047.15 was actually received by petitioner's predecessor and should likewise *214 be eliminated. Deducting these two items, totaling $1,918.50, leaves a balance of $6,818.61 as the amount in controversy. Of this latter amount petitioner's predecessor had accrued the sum of $3,463.75 as an account receivable prior to January 31, 1935. The predecessor being on the accrual method of accounting, the item was reflected in its income. As respects petitioner it was an asset which it took over under the plan of reorganization under 77B, and its receipt by petitioner was merely the liquidation of a capital asset. We now consider petitioner's liability for unjust enrichment taxes with respect to the balance of the reimbursement in the amount of $3,354.86 for cotton bags purchased by petitioner prior to January 6, 1936. The burden was clearly upon the petitioner to establish the fact that the processing tax was not passed on to its customers. It has made no attempt to show that fact, but relies on the favorable "margin" for the taxable period shown with respect to the processing tax on refined sugar. Petitioner argues, since it knew at the time it paid the tax to the processor from whom the bags were purchased the amount of the tax was to be refunded, it is only fair to *215 assume it did not shift the burden of that tax. Notwithstanding the reasonableness of the inference, we do not think it a satisfactory substitute for the proof required by the statute. Since petitioner is not a processor or a vendor of cotton bags as such and sold the bagged sugar on a competitive market, it may have been impossible to furnish the required proof. However, impossibility of proof of a material fact leaves the one having the burden of proof with a claim that is unenforceable. Burnet v. Houston, 283 U.S. 223. We conclude that petitioner has not established the fact it did not pass on to its vendees the processing tax on cotton bags to the extent of the sum of $3,354.86, and have so found as a fact. Decision will be entered under Rule 50. Footnotes
1. Sec. 213 (g) (1) of the Revenue Act of 1939 reads as follows: (g) Definition of Reorganization Under Prior Acts. - (1) Section 112 (g) (1) of the Revenue Acts of 1938, 1936, and 1934 are amended to read as follows: "(1) The term 'reorganization' means * * * or (C) a transfer by a corporation of all or a part of its assets to another corporation if immediately after the transfer the transferor or its shareholders or both are in control of the corporation to which the assets are transferred * * *".↩